**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

v.                                              No. 00-4409

VERNON RAY, a/k/a Donnie Blue,
              *Defendant-Appellant.*

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

v.

DARRELL ANTONIO BURRELL, a/k/a            No. 00-4422
Silly Rabbit,
              *Defendant-Appellant.*

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

v.

ANDRE ALBERT ADDISON, a/k/a Oofa,         No. 00-4800
a/k/a Poobie,
              *Defendant-Appellant.*

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, Senior District Judge.
(CR-98-210)

Argued: December 4, 2002

Decided: March 19, 2003

Before GREGORY, Circuit Judge, Joseph R. GOODWIN,
United States District Judge for the Southern District of West
Virginia, sitting by designation, and
James H. MICHAEL, Jr., Senior United States District Judge
for the Western District of Virginia, sitting by designation.

---

Affirmed in part, reversed in part, vacated in part, and remanded by
unpublished opinion. Judge Goodwin wrote the opinion, in which
Judge Gregory and Senior Judge Michael joined.

---

## COUNSEL

**ARGUED:** Jennifer Marie O'Connor, WILMER, CUTLER & PICK-
ERING, Washington, D.C., for Appellant Ray; Michael Daniel Mon-
temarano, Baltimore, Maryland, for Appellant Burrell; Noell Peter
Tin, Charlotte, North Carolina, for Appellant Addison. Jamie M. Ben-
nett, Assistant United States Attorney, Baltimore, Maryland, for
Appellee. **ON BRIEF:** Paul F. Enzinna, Rebecca H. Ewing, BAKER
BOTTS, L.L.P., Washington, D.C., for Appellant Ray; Rebecca Tin,
Charlotte, North Carolina, for Appellant Addison. Thomas M.
DiBiagio, United States Attorney, Baltimore, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

---

## OPINION

GOODWIN, District Judge:

Vernon Ray, Darrell Burrell and Andre Addison, along with other
co-defendants, were charged in a ten-count indictment with various
crimes related to a cocaine distribution conspiracy. Following a
month-long trial, Ray, Burrell and Addison were each convicted of

conspiracy to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846 & 841(a)(1), and of killing while engaging in a narcotics conspiracy, in violation of 21 U.S.C. § 848(e)(1)(A). Addison was additionally convicted of possession with intent to distribute cocaine, also in violation of § 841(a)(1). Ray, Burrell and Addison appeal their convictions on a number of grounds, the precise nature of which are more fully explained below.

For the reasons that follow, we conclude that the government presented insufficient evidence from which a reasonable jury could conclude, beyond a reasonable doubt, that Ray knowingly furthered the objectives of the cocaine distribution conspiracy. Because both of Ray's counts of conviction depend on proof of this intent, we reverse his conviction on both counts. We also conclude, as the government concedes, that Burrell was denied his statutory right to two counsel. We therefore vacate his conviction for killing while engaging in a drug conspiracy. We also vacate his sentence and remand for resentencing on the cocaine distribution conspiracy count alone. We find the remaining objections without merit, and affirm Burrell's conviction on the cocaine distribution conspiracy count and Addison's conviction on all counts.

I.

This case involves a Baltimore, Maryland-based cocaine distribution conspiracy, a related drug turf war between rival gangs, the "Chapel Hill Gang" and the "Jefferson Street Boys," and a series of shootings arising out of that turf war. The evidence presented at trial showed that the Chapel Hill Gang controlled various streets in the vicinity of Johns Hopkins University, operating a narcotics-distribution ring that included the sale of vast amounts of cocaine. The Chapel Hill Gang's dominance was not absolute; the rival Jefferson Street Boys had also staked a claim in the area's drug market. To eliminate competition and corner drug territory, the gangs mounted an ongoing war that involved fistfights, drive-by shootings, and murders ordered by gang superiors. What had begun as a cross-town squabble over sandlot basketball games had escalated into urban guerilla warfare.

The government's evidence demonstrated that Andre Addison was the leader of the Chapel Hill Gang. Over a period of years, Addison

purchased large amounts of cocaine, heroin and marijuana in New York City. He and other gang members transported the drugs to Baltimore and then sold them, primarily on Ashland Street and Madeira Street. Kelly McLeod oversaw the gang's day-to-day operations and finances as its "lieutenant," while Darrell Burrell strong-armed foes as its primary "enforcer." Marcel Brown, Tavon Dixon, George Brandon, Morgan Kelly, Lloyd Taylor, Keith Cook and Adrian Boone also worked for the gang at various times, primarily roaming the streets as drug dealers. Many of these individuals, including McLeod, Brown and Dixon, cooperated with the government pursuant to plea agreements and offered testimony related to the gang's organization and operations. Officer Deron Garrity, who investigated the gang for the Baltimore City Police Department, also testified at length concerning the drug operation.

In the summer of 1996, Addison asserted drug distribution dominance over a section of Jefferson Street that traditionally had been controlled by the Jefferson Street Boys. Addison's actions fueled a battle over territory, triggering a string of shootings. Because the specific facts underlying these various shootings are important to the issues on appeal, we will present this evidence in some detail.

The testimony showed that the rivalry between the Chapel Hill Gang and the Jefferson Street Boys long predated the drug territory dispute. According to Kelly McLeod, it began "when we was younger," starting with "neighborhood fist fights" over playground problems and basketball games, not drugs. Similarly, Mayo Bennett testified that the "bad blood" existed when they were as young as ten or eleven years old. Drugs and drug-related shootings entered the picture sometime prior to 1994.

As part of the drug turf war, Silvester Snider, a member of the Jefferson Street Boys, attempted to shoot Addison on more than one occasion. In retaliation, the Chapel Hill Gang killed Snider, also known as "Monk," on May 25, 1996. Chapel Hill Gang member Marcel Brown, as well as others, testified that Addison had ordered the killing and that Burrell had carried it out at his command. Prior to the Snider murder, Brown overheard Addison and Burrell talking about Snider: "Andre was saying to Burrell that that punk Monk [Snider] can't keep running down here shooting." Once Burrell became aware

of Brown's presence, "Burrell stopped [Addison] and said, hey, man, don't be talking to me about no shit like that around these whores like that." At other times prior to the killing of Snider, Brown heard Addison say that "they [the Jefferson Street Boys] gonna die, . . . they're going to stop coming down here shooting and shit." Brown testified that Addison "told us to just stay around the block and keep doing what we doing [i.e., dealing drugs], and he got everything taken care of. He already got Darryl on top of that." By Darryl, "I'm talking about Mr. Burrell." Pressed further, Brown clarified that Addison said "I got Darryl on top of them. He gonna handle that. Them boys ain't going keep coming here shooting. You see that bitch Monk and that bitch Antwan [Greer], them whores know what's up." At some point after these conversations, Brown heard from Addison that "Monk shot at Darryl's car," and then "Darryl turned around and came back and shot [Snider]." George Brandon similarly testified that Addison "told me he said to do it [the Snider killing]," and the person he sent was "Silly Rabbit," an alias for Burrell.

Weeks later, on June 12, 1996, Addison was again the target of a Jefferson Street Boys shooting. This time, he was seriously wounded while helping a neighbor install a basketball hoop. In retaliation, Burrell killed Jefferson Street Boy Antwan Greer later that day. McLeod testified that following Addison's shooting, "Burrell hopped on the bike and proceeded through the projects, knowing that they [Antwan Greer and others] would get caught at the light on Orleans Street." McLeod heard gunshots, and later "Addison let me know that Burrell killed him [Greer]." Testimony from George Brandon also linked Burrell to the Greer murder.

According to Brown, after Burrell had been incarcerated for the Snider and Greer killings, Addison stated that "he had already taken care of the lawyer fees [for Burrell] as far as the murders and stuff" and that he had "giv[en] to his baby['s] mother money." Despite the fact that Burrell was not involved in the drug distribution, McLeod provided Burrell with money from drug proceeds at least "five to six times," always at the request of Addison.

Additional shootings transpired in September of 1997, and it is here that Vernon Ray first appears in the story. Before detailing this next round of shootings, we pause to provide some background about

Ray. Ray grew up in Baltimore, and he and Addison were childhood friends. Ray's brother, Paul Ray, was a member of the Chapel Hill Gang at least as early as 1994 or 1995. Several of the government's witnesses who were members of the Chapel Hill Gang listed the individuals engaged in the drug conspiracy, including descriptions of each person's role. Not one of these witnesses, each of whom had extensive knowledge of the Chapel Hill Gang's cocaine distribution operation, identified Ray as a participant in the drug conspiracy. Gang "lieutenant" Kelly McLeod testified that while Ray's brother Paul was an active participant in the operation, Ray "wasn't really into the drug business with us." When describing the Chapel Hill Gang's drug organization hierarchy, McLeod made no mention of Ray. According to McLeod, "Vernon Ray wouldn't be with us every day. He really wasn't with us."

Tavon Dixon also testified to the drug operations of the Chapel Hill Gang, explicitly naming those individuals involved in the conspiracy. Like McLeod, Dixon made no mention of Ray being involved with the drug operations. Indeed, despite Ray's intimate personal connections with these gang members, the government's witnesses indicated that he had never been a member of the Chapel Hill Gang. According to McLeod, in 1994 or 1995 Ray was not "working with [the Chapel Hill Gang] . . . drug organization." Rather, "he was . . . freelancing with the Jefferson Street Boys," and "was neutral" as between the rival gangs.

Although Ray was not a member of either gang, the Jefferson Street Boys "thought he was trading on them," i.e., working with the rival Chapel Hill Gang, so members of the Jefferson Street Boys shot Ray sometime in 1994 or 1995. Following Ray's shooting, two of his friends — McLeod and Addison — attempted to retaliate. The attempt failed when McLeod's gun jammed, prompting a retreat by McLeod and Addison in the face of return fire. McLeod testified that he and Addison took action against the Jefferson Street Boys because "[b]eing as though Mr. Ray had got shot, and Mr. Ray is a close friend of mine, [we acted out of] retaliation." The government then asked McLeod to further "explain why it was that you were retaliating for the shooting of Mr. Ray *who was with the Jefferson Street Boys*." (Emphasis added.) McLeod responded that "[Vernon Ray's] brother Paul Ray was with us, [and] . . . I went to school with Mr. Vernon

Ray . . . and like I said before, I took him as a real close friend of mine. And where we came from, we still all stuck together. One, he was hurt, so our chain of thought was to hurt one of them who hurt him." After Ray's shooting, McLeod testified that Ray "was no longer up on Jefferson Street. He had come down with us, but he wasn't really into the drug business with us. He was still freelancing at this time."[1]

Ray's involvement with the drug conspiracy, according to the government, began (and ended) on September 7, 1997. This brings us back to our ongoing description of the turf war shootings. On September 7, a member of the Jefferson Street Boys came to the Ashland and Madeira Street vicinity and shot Morgan Kelly, a friend of Ray's and a member of the Chapel Hill Gang. In response, McLeod and others decided to "[g]o return fire as usual." McLeod described their plan:

> [McLeod, his brother], Chad Brown, Lloyd Taylor, Keith Cook, [and] Vernon Ray . . . came out with a plan to go up to Jefferson Street and shoot whoever was out there. . . . The plan was to drive a car down the one way of Collington . . . and that was to flush them out, and then my brother [and] Vernon Ray and Keith Cook would be on . . . McElderry and Collington. So we would flush him out and make him run toward them.

McLeod, Brown and Taylor drove in one car and McLeod's brother, Ray and Cook were in another. All of the participants had guns,

---

[1]McLeod's testimony paints the picture that Ray had always remained an independent "freelancer" and had never joined either gang, even after members of the Jefferson Street Boys had shot him due to their assumption that he was working with the Chapel Hill Gang. The government witnesses did not elaborate on the precise nature of Ray's "freelancing." Indeed, the jury was left to speculate, without any clarification from the government or its witnesses, as to the meaning of "freelancing." The only evidence of Ray's involvement with drug dealing was testimony from Marcel Brown implicating Ray in a marijuana dealing operation on Eager and Chester Streets. This operation was not linked to the Chapel Hill Gang cocaine conspiracy. It is possible that this marijuana distribution was the "freelancing" referred to by McLeod.

which they had "checked . . . before [they] left" to "make sure they had ammunition." They carried out the plan, essentially as described above, although shots were fired by both sides. Ray, among others, was shot in the shoulder. Bernard Miller, a member of the Jefferson Street Boys, was shot and killed.

Ray, Burrell and Addison were indicted along with Marcel Brown, Morgan Kelly, Kelly McLeod and Adrian Boone. Brown, Kelly and McLeod plead guilty and testified at trial.[2] The jury convicted Ray, Burrell and Addison of conspiracy to distribute more than five kilograms of cocaine in violation of 21 U.S.C. §§ 846 & 841(a)(1), and of killing while engaging in a drug conspiracy, in violation of 21 U.S.C. § 848(e)(1)(A). The jury also convicted Addison of distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1). Addison and Burrell were given life sentences, and Ray was sentenced to 262 months of imprisonment.

## II.

The defendants raise numerous challenges to their convictions. Specifically, the defendants (either singly or in groups) raise claims based on the sufficiency of the evidence; the statutory right to two counsel for death-eligible offenses; violations of *Brady v. Maryland*, 373 U.S. 83 (1963); the knowing use of false testimony against them; errors in the jury instructions related to the elements of conspiracy; errors in the indictment, jury instructions, and closing argument related to the necessary connection between the killings and the drug conspiracy; flaws in the search warrant; errors in the court's refusal to sever, to provide limiting jury instructions, or to provide a multiple conspiracy instruction; and errors in the court's admission of evidence related to the Snider killing, refusal to instruct on self-defense related to that killing, and improper comments by the prosecution in closing argument. We will address these contentions in turn. We begin with the claims related to the sufficiency of the evidence.

---

[2]The remaining defendant, Boone, was a fugitive of justice at the time of trial. The district court's docket sheet indicates that Boone eventually was arrested in Texas and initially appeared before the court on October 30, 2001.

A.

Both Ray and Burrell challenge the sufficiency of the evidence to sustain their convictions. According to the evidence presented by the government, neither Ray nor Burrell actually dealt drugs or supervised the drug distribution operation for the gang. Rather, the government contends that both served as "enforcers" for the gang — that is, performed acts of violence and intimidation in furtherance of the drug conspiracy's ongoing attempt to secure and expand its distribution territory. Although both defendants were convicted of conspiracy to distribute cocaine as well as killing while engaging in a drug conspiracy, their alleged participation in the drug conspiracy stems solely from their participation in the killings.[3] Accordingly, in both cases the two counts stand or fall together.

In reviewing a conviction for sufficiency of the evidence, the court, "constru[ing] the evidence in the light most favorable to the government," asks "whether any rational trier of facts could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Giunta*, 925 F.2d 758, 764 (4th Cir. 1991) (internal quotations and citation omitted). "To prove a drug conspiracy, the Government must prove the following: (1) an agreement with another person to violate the [drug] law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and (4) interdependence among the alleged conspirators." *United States v. Stewart*, 256 F.3d 231, 250 (4th Cir. 2001) (internal quotations and citation omitted). This court has explained that "the Government must prove the existence of a conspiracy beyond a reasonable doubt, but upon establishing the conspiracy, only a slight connection need be made linking a defendant to the conspiracy to support a conspiracy conviction, although this connection also must be proved beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc). A defendant's "slight connection" to the conspiracy may be proven by direct or circumstantial evidence, but "the Govern-

---

[3]Ray was indicted for the shooting of Bernard Miller. Burrell was indicted for the shooting of Silvester Snider and Antwan Greer. The Snider shooting was only alleged as an overt act in the conspiracy, not as an independent violation of § 848(e) (killing while engaged in the conspiracy).

ment nevertheless must establish proof of each element of a conspiracy beyond a reasonable doubt." *Id.* at 858. With these principals in mind, we first consider the evidence related to Ray's conviction and then the evidence related to Burrell's conviction.

1.

As should be clear from the statement of facts, the government presented ample evidence of proof of the first element of conspiracy — "an agreement with another person to violate the law," *Stewart*, 256 F.3d at 250, as among the active members of the Chapel Hill Gang. In order to establish Ray's participation in that drug conspiracy, the government relies on evidence that, it claims, proves (1) that Ray knew of the Chapel Hill Gang drug distribution conspiracy, and (2) that he knowingly participated in the Bernard Miller shooting. Based on these two facts, the government argues, a reasonable jury could have concluded, beyond a reasonable doubt, that Ray knowingly joined the drug conspiracy when he participated in the Miller shooting. Throughout all of the events described above leading up to the Miller shooting — from the early days of the neighborhood rivalry, to the introduction of drug dealing by members of the rival gangs, to Ray's own shooting by the Jefferson Street Boys — the government concedes that there is no suggestion that Ray was ever a member of the Chapel Hill Gang drug distribution conspiracy. Even after Ray's shooting in 1994 or 1995, nothing in the evidence suggests that he became a member of the drug conspiracy — in fact, the evidence affirmatively shows the opposite — that he was "freelancing" at this time. Not until September 7, 1997, does the government contend that Ray suddenly took action in an effort to join the drug distribution conspiracy and to further its objectives. On the government's theory of the case, Ray's only connection to the drug conspiracy was his participation in the Miller shooting on September 7, 1997.

Of course, "a defendant properly may be convicted of conspiracy . . . 'even though he had not participated before and even though he played only a minor part.'" *Burgos*, 94 F.3d at 858 (quoting *United States v. Roberts*, 881 F.2d 95, 101 (4th Cir. 1989)). While a defendant may be convicted of a conspiracy even if he performed only one act as part of that conspiracy, the government must prove that "'he join[ed] the conspiracy with an understanding of the unlawful nature

thereof and willfully join[ed] in the plan on one occasion.'" *Id.* We first consider whether the government presented evidence from which a reasonable jury could conclude that Ray knew of the existence of the drug conspiracy.

McLeod's testimony about Ray's "freelancing" is the only testimony presented at the month-long trial that even arguably suggests that Ray knew about the existence of the ongoing drug-related turf war between the two gangs. McLeod's testimony makes it clear that Ray was aware of the *neighborhood* rivalry — indeed, Ray was shot by members of the Jefferson Street Boys because they thought he was associating with the Chapel Hill Gang. But as McLeod explained, the neighborhood rivalry long predated the drug territory dispute. It began "when we was younger," as a neighborhood rivalry that started with "neighborhood fist fights."

Accordingly, the government relies heavily on inferences drawn from the term "freelancing" to establish that Ray knew about the ongoing drug distribution conspiracy. Specifically, the government argues that the jury could reasonably infer that the term "freelancing" meant that Ray was dealing drugs, albeit independently, in the same territory as the Jefferson Street Boys and the Chapel Hill Gang. The government did not ask any of its witnesses to clarify the meaning of "freelancing," which perhaps would have buttressed their position that Ray himself was dealing drugs in this area. McLeod's testimony is equivocal at best. He stated that Ray "wasn't really into the drug business with us. He was still freelancing at this time." One could read this statement to imply that "freelancing" means something *other* than drug dealing, as the statement that Ray was "still freelancing" immediately followed the statement that "he wasn't really into the drug business." Alternately, one could read this statement with emphasis on "with us" — that is, that Ray wasn't into the drug business *with us*, but was freelancing, meaning dealing drugs independently of the Chapel Hill Gang. Because we review a conviction for sufficiency of the evidence by drawing all reasonable inferences in favor of the government, we conclude that McLeod's testimony was sufficient for a reasonable jury to find, beyond a reasonable doubt, that Ray was himself dealing drugs in the area and therefore knew of the ongoing drug-related turf war between the rival gangs.[4] This satisfies the second ele-

---

[4]The government argues that the jury could also infer Ray's knowledge of the drug conspiracy based on (1) the fact that his brother was a

ment from *Stewart* — that a defendant must have "knowledge of the essential objectives of the conspiracy." *Stewart*, 256 F.3d at 250.

This brings us to the third element of conspiracy, "knowing and voluntary involvement." *Id.* Here, the government contends that Ray's "knowing and voluntary involvement" in the conspiracy consists of his participation in the Miller shooting. For Ray's participation in that shooting to constitute knowing involvement in the conspiracy, the government must prove that Ray knowingly acted "in furtherance of the objective of the conspiracy." *United States v. Brown*, 943 F.2d 1246, 1250 (10th Cir. 1991). *See also United States v. Gee*, 226 F.3d 885, 893 (7th Cir. 2000) ("The government must prove that a defendant knowingly and intentionally joined the charged conspiracy, knowing the conspiracy's aims *and intending to achieve them*." (emphasis added)).

The government concedes that it presented no direct evidence of Ray's intentions when he participated in the Miller shooting. Of course, "a conspiracy generally is proved by circumstantial evidence and the context in which the circumstantial evidence is adduced." *Burgos*, 94 F.3d at 857. Here, the government argues that given Ray's knowledge of the drug conspiracy and his participation in the Miller shooting, the jury could infer, beyond a reasonable doubt, that Ray

member of the Chapel Hill Gang, and (2) the general knowledge in the community about the ongoing drug turf war. As for the former point, "it is well-settled that a conspiracy cannot be proven solely by family relationship or other types of close association." *United States v. White*, 569 F.2d 263, 268 (5th Cir. 1978). *See also United States v. Dozie*, 27 F.3d 95, 98 (4th Cir. 1994) (refusing to infer knowledge or intent to further conspiracy based on husband-wife relationship). We are also uncomfortable with the suggestion that one of the important elements of a conspiracy offense — knowledge of the conspiracy — can be established merely by the defendant's residence in a bad neighborhood. Without specifically establishing how a defendant's residence in a neighborhood translates into his knowledge of criminal activity, this strikes us as an impermissible attempt to infer guilt by association. *See United States v. Robel*, 389 U.S. 258, 265 (1967). We decline to evaluate this evidence in this case, as we conclude above that Ray's knowledge of the conspiracy could be inferred from McLeod's testimony.

participated in the shooting in order to further the drug conspiracy. This court has explained that "[c]ircumstantial evidence sufficient to support a conspiracy conviction need not exclude every reasonable hypothesis of innocence, provided the summation of the evidence permits a conclusion of guilt beyond a reasonable doubt." *Id.* at 858. Many courts have recognized the difficulty in determining, on the particular facts of a given case, when a jury's verdict "crosses the line from permissible inference to improper speculation." *United States v. Teffera*, 985 F.2d 1082, 1088 (D.C. Cir. 1993). *See also Goldhirsh Group, Inc. v. Alpert*, 107 F.3d 105, 108 (2d Cir. 1997) ("The line between permissible inference and impermissible speculation is not always easy to discern. . . . At some point, the link between the facts and the conclusion becomes so tenuous that we call it 'speculation.' When that point is reached is, frankly, a matter of judgment.").

We now turn to evaluate the reasonableness of the government's proposed inference in light of the particular facts and circumstances of this case. We note that this claim does not involve, as do many sufficiency of the evidence challenges, questions of witness credibility or of resolving conflicting evidence. Such matters "'are within the sole province of the [fact finder] and are not susceptible to judicial review.'" *Burgos*, 94 F.3d at 863 (quoting *United States v. Lowe*, 65 F.3d 1137, 1142 (4th Cir. 1995)). In this case, Ray presented no testimony or evidence at all, so there are no conflicting evidentiary questions to be resolved. We also note that, as is evident from the statement of facts, there was clearly evidence sufficient to establish Ray's guilt of a state homicide offense in the shooting of Bernard Miller.[5] But that is not the issue in this case. Rather, the question is whether the evidence presented by the government is sufficient to permit a reasonable jury to infer, beyond a reasonable doubt, that Ray participated in the Miller shooting with the intent to further the drug conspiracy.

---

[5]We do not speculate as to what specific homicide offense Ray might be guilty of. The evidence suggested that Ray did fire shots, as he had gunpowder residue on this hands, but that he probably did not fire the shot that killed Bernard Miller. We simply note that the evidence likely establishes Ray's guilt of some type of state homicide offense.

In *Burgos*, this court explained that "[c]ircumstantial evidence tending to prove a conspiracy may consist of a defendant's 'relationship with other members of the conspiracy, the length of this association, [the defendant's] attitude [and] conduct, and the nature of the conspiracy.'" *Burgos*, 94 F.3d at 858 (quoting *United States v. Collazo*, 732 F.2d 1200, 1205 (4th Cir. 1984)). Usually, the closer and longer the relationship between the defendant and the conspiracy members, the more reasonable the inference that the defendant was a member of the conspiracy. But here, the government's witnesses made clear that Ray had *not* become a member of the drug conspiracy in spite of his close connection with members of the conspiracy over the years. This makes it *less* reasonable to infer that Ray's participation in this shooting was in furtherance of the drug conspiracy.

Additionally, the testimony indicates that while much of the violence in the neighborhood was drug-related, some of it was simply an artifact of a long-running neighborhood rivalry that predated, and was unrelated to, any drug dealing. McLeod's and Addison's attempt to retaliate for Ray's shooting is one example of violent actions that appear unrelated to the drug conspiracy. The government's own questioning, as well as McLeod's response, indicate that their actions were not related to the drug conspiracy. When asked why he and Addison, members of the Chapel Hill Gang, would retaliate for the shooting of Ray, then associated with the Jefferson Street Boys, McLeod explained that their motivation was personal: "I went to school with Mr. Vernon Ray . . . and like I said before, I took him as a real close friend of mine. And where we came from, we still all stuck together. One, he was hurt, so our chain of thought was to hurt one of them who hurt him." It is clear from these circumstances that McLeod's and Addison's attempt to retaliate for Ray's shooting was not drug-related — indeed, their retaliation did not make sense when considered solely in the context of the drug war. Instead, as McLeod clearly explained, they attempted to retaliate for Ray's shooting because he was a childhood friend, and in their neighborhood, friends stuck together.

Ray's involvement in the Miller shooting appears to be similar in nature: Ray joined his friends in retaliation for the shooting of their long-time personal friend, Morgan Kelly. As with the actions following his own shooting years earlier, Ray's participation in the Miller

shooting can more plausibly be described as an act of personal revenge than as an act to further the drug conspiracy — a conspiracy that according to the government's witnesses he had never joined. The government argued at trial that Ray participated in the Miller shooting in order to join the Chapel Hill Gang drug conspiracy and thereby receive protection from that gang against the Jefferson Street Boys, who had shot him years earlier. But had Ray intended to join the Chapel Hill Gang's drug conspiracy to obtain protection, he presumably would have done so soon after his shooting. According to McLeod's testimony, after Ray's shooting Ray left the Jefferson Street Boys' territory and spent time in the Chapel Hill Gang's turf. Nonetheless, Ray kept his distance from, and did not join, the Chapel Hill Gang's drug distribution conspiracy.

"Circumstantial evidence sufficient to support a conspiracy conviction need not exclude *every* reasonable hypothesis of innocence." *Burgos*, 94 F.3d at 858 (emphasis added). The evidence must, however, "permit[ ] a conclusion of guilt *beyond a reasonable doubt*." *Id.* (emphasis added). Thus, the fact that the evidence would permit a jury to find that Ray *might* have participated in the shooting with the intent to further the drug conspiracy, or even that he *probably* did so, is not adequate to sustain his conviction. The evidence must permit a conclusion beyond a reasonable doubt. As the D.C. Circuit stated in *Teffera*, "[w]hile we recognize that the government's proof need not be so certain as to exclude all inferences of innocence, in a case where the government's overall evidence of guilt is so thin, the alternate hypotheses consistent with innocence become sufficiently strong that they must be deemed to instill a reasonable doubt in our hypothetical reasonable juror." *Teffera*, 985 F.2d at 1088.[6] *See also United States v. Atehortva*, 17 F.3d 546, 552 (2d Cir. 1994) (reversing conspiracy conviction based in part on the fact that "[t]his is not a case in which there is no other plausible explanation for the appellant's actions.").

---

[6]Of course, Ray's conduct can in no way be described as "innocent." There is ample evidence of Ray's guilt of a state law homicide offense. *See supra* note 5. In this case the question is whether there are alternative hypotheses for Ray's participation in the murder that would indicate that he did not act with the intent to further the drug conspiracy, and if so, whether those alternative hypotheses are sufficiently strong as to instill a reasonable doubt in the mind of a reasonable juror.

As explained above, there are plausible alternative hypotheses for Ray's participation in the murder — namely, personal revenge for the shooting of his friend, much like the personal revenge that motivated McLeod's and Addison's response to his own shooting years earlier. Ray might also have acted, at least in part, in response to his own shooting at the hands of the Jefferson Street Boys years earlier. The testimony elicited by the government from its own witnesses provided strong evidence that over the life of this conspiracy, Ray was never a member of the drug distribution scheme. This despite the fact that he had the time and opportunity, by proximity and association, to join the conspiracy in the pursuit of money or any of the other purposes for which one might engage in such criminality. Not once did the government ask its witnesses whether Ray had ever been hired or served as an enforcer for the gang. Not once did it ask whether he had ever been paid (or promised) a dime for his services. Not once did it ask whether Ray had said anything about why he was joining them in their September 7, 1997 attack on the Jefferson Street Boys.

Nevertheless, the government asks us to conclude that a reasonable jury could find, beyond a reasonable doubt, that Ray, who resisted joining the conspiracy for many years, suddenly decided that he wanted to ensure the success of that drug distribution operation. They ask us to conclude this even in the face of evidence of alternative plausible motivations for his act, namely avenging the shooting of a long-time friend and/or his own shooting. In light of the specific facts and circumstances of this case, the defense theory of Ray's participation in the Miller shooting is far more plausible than the government's theory. This is a case where "the alternate hypotheses [regarding Ray's intent are] . . . sufficiently strong that they must be deemed to instill a reasonable doubt in our hypothetical reasonable juror." *Teffera*, 985 F.2d at 1088. The government's proposed evidentiary leap "crosses the line from permissible inference to improper speculation." *Id.* We conclude, given the alternative plausible explanations for Ray's participation in the murder, that the government failed to present evidence from which a reasonable jury could conclude, beyond a reasonable doubt, that Ray participated in the shooting in order to further the drug conspiracy.

In so holding, we are not placing insurmountable evidentiary burdens on the government. We are aware that "[b]y its very nature, a

conspiracy is clandestine and covert, thereby frequently resulting in little direct evidence of such an agreement," such that "a conspiracy generally is proved by circumstantial evidence and the context in which the circumstantial evidence is adduced." *Burgos*, 94 F.3d at 857. If the circumstantial evidence permitted the inference, beyond a reasonable doubt, that Ray participated in the Miller shooting in order to further the drug conspiracy, we would not hesitate to affirm his conviction despite the lack of more direct evidence of his intent. Furthermore, the course of the testimony at trial makes it clear that the government had many opportunities that it failed to pursue that could have shed more light on Ray's intent when participating in the murder. A number of gang members, including McLeod, who participated in the Miller shooting, testified at length at trial. The government easily could have pressed these witnesses for further details regarding Ray's participation in the Miller shooting, in particular regarding his participation, if any, in discussions during the planning of that shooting. Instead, as the government conceded at Ray's sentencing, the evidence demonstrated that Ray "wasn't involved in earlier excursions to try to retaliate on the Jefferson boys that occurred on that day, and he was not involved in the planning of [the Miller shooting]."

As the Seventh Circuit has explained, "[a] person who is indifferent to the goals of an ongoing conspiracy does not become a party to this conspiracy merely because that person knows that his or her actions might somehow be furthering that conspiracy." *United States v. Collins*, 966 F.2d 1214, 1219-20 (7th Cir. 1992). Similarly, the First Circuit has stated that "even with knowledge that a conspiracy exists, one who allegedly 'joins' only by furnishing some peripheral service can hardly be deemed to have 'agreed' to conspire through his conduct unless he has the aim to forward or assist the conspiracy." *United States v. Garcia-Torres*, 280 F.3d 1, 4 (1st Cir. 2002) (citation omitted). That is to say, a defendant's knowledge of an ongoing conspiracy combined with actions which, at least in part, further that conspiracy, do not always establish the defendant's guilt of the conspiracy. There may well be cases in which these two factors — knowledge of an ongoing conspiracy and actions which further that conspiracy — are sufficient standing alone to support a reasonable inference that the defendant sought to further the conspiracy. But the facts of this case imply the contrary — namely, that Ray's participation in the shooting was personal in nature, not in furtherance of the

drug conspiracy. Accordingly, we reverse Ray's conviction on both counts, as the government presented insufficient evidence from which a reasonable jury could infer, beyond a reasonable doubt, that Ray ever acted with the intent to further the drug distribution conspiracy.[7]

2.

We now turn to consider whether the evidence presented was sufficient to support Burrell's conviction. We are not entirely clear of the precise nature of Burrell's argument in this regard, as he simply incorporates Ray's argument in the joint brief for the appellants. Ray's argument was based very heavily on the specific facts of his case and on the details surrounding his participation in the Miller murder. Burrell was not involved in the Miller murder, but was convicted based on evidence tying him to the killings of Silvester Snider and Antwan Greer. Accordingly, it is difficult to know how Burrell intends to adopt Ray's argument.

Under Rule 28(a)(9)(A) of the *Federal Rules of Appellate Procedure*, an appellant's brief "must contain . . . the argument, [including] appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." By incorporating Ray's argument, Burrell can perhaps be said to have cited certain legal authorities — those related generally to sufficiency of the evidence — on which he would rely. But unsurprisingly, as the two alleged murders are entirely separate incidents, Ray's argument contains no discussion of the factual basis of Burrell's claim. Burrell thus has utterly failed to supply the factual reasons for his claim or any citations to those parts of the record on which his claim relies. Appellate courts generally decline to review an "asserted but unanalyzed . . . claim," because "appellate courts do not sit as self-directed boards of legal inquiry and research, but [rather] . . . as arbiters of legal questions presented and argued by the parties before them." *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, Circuit Judge). *See also Nat'l Metalcrafters, Div. of Keystone Consol. Indus. v. McNeil*, 784 F.2d 817, 825 (7th Cir. 1986) ("[T]he appellant

---

[7]Ray raises a number of additional challenges to his conviction. Because we reverse his conviction, we need not address any of these additional claims.

ha[s] raised [a ground for reversal] but . . . presented [it] in so perfunctory and underdeveloped a manner in his brief that we shall not consider it." (quotations and citations omitted)). Given Burrell's failure to articulate the basis for his claim, we would be fully justified in refusing to review it altogether. Nevertheless, out of an abundance of caution and because Burrell's ineffective assistance claim is not difficult to reject on the merits, we will address it.[8]

As should be clear from our recitation of the facts, there was ample testimony from which the jury could conclude that Addison had instructed Burrell to protect Addison's drug distribution operation by killing Greer and Snider, who had been shooting at Chapel Hill Gang members in the area and disrupting his drug operation. Addison reassured his drug dealers that they need not worry about these shootings, as he had Burrell "on top of it." There is testimony that Burrell then shot Snider and Greer, and after the shootings was provided money from the drug distribution proceeds. Thus, there is more than sufficient evidence for a jury to conclude, beyond a reasonable doubt, that Burrell committed the Snider and Greer shootings, and that he did so at the request of Addison with the intent to further Addison's drug distribution operation and to benefit himself by receiving proceeds of that drug operation. Accordingly, Burrell's argument that the government presented insufficient evidence to support his conviction is without merit.

## B.

Both Addison and Burrell were indicted on death-eligible offenses, namely violations of 21 U.S.C. § 848. Under the provisions of 18 U.S.C. § 3005, each was entitled to two attorneys upon request. In February of 1999, the Department of Justice determined that it would not seek the death penalty against either defendant. Addison requested that he be permitted to retain two lawyers, and this request was approved. Burrell also requested two attorneys, but this request was

---

[8]We emphasize that our review of Burrell's inadequately presented claim is entirely a matter of our discretion. Litigants who present unanalyzed claims run the great risk that this court will refuse to review them at all.

denied.[9] Accordingly, Burrell was only represented by one lawyer at trial.

The government concedes that Burrell requested two attorneys and that, in light of this court's decision in *United States v. Boone*, 245 F.3d 352 (4th Cir. 2001), his conviction for the death-eligible offense, killing while engaging in a drug conspiracy, must be vacated. The only issue debated between the parties is the impact of this on Burrell's other count of conviction, namely conspiracy to distribute cocaine. The government argues that we should simply vacate Burrell's sentence (as Burrell received a single sentence based on both counts taken together) and remand for resentencing on the drug conspiracy count alone. Burrell, in contrast, argues that the denial of two counsel infects his entire trial and that both counts of conviction must be vacated and remanded for retrial. The parties have not cited, and we have not found, any caselaw directly addressing this particular scenario, so this issue is one of first impression.

The defense contends that affirming Burrell's conviction on the non-death-eligible count would in effect constitute an *ex post facto* severance. We think that this overstates matters. It is frequently the case that an error at trial infects only one of multiple counts of conviction, and courts routinely affirm the unaffected counts without concern that doing so creates an impermissible *ex post facto* severance of the counts or any other legal problem. *See, e.g.*, *United States v. Silvers*, 90 F.3d 95, 98-99 (4th Cir. 1996); *United States v. Meriwether*, 486 F.2d 498, 504 (5th Cir. 1973). In this case, the statutory purpose of § 3005, which is to provide two counsel to defendants facing a death-eligible count, is adequately served by vacating Burrell's conviction on the death-eligible count. It is true that a defendant receiving two attorneys under § 3005 is entitled to have those attorneys work on all of the charges for which he has been indicted. But we are not persuaded that this incidental benefit should be treated as an entitlement warranting reversal on all counts. Accordingly, we reject Burrell's argument that both of his counts of conviction must be vacated.[10]

---

[9]It is not clear (nor relevant) why Addison's request for two attorneys was granted while Burrell's was denied.

[10]The government claims in its brief that Burrell's ultimate sentence will not be affected by our vacatur of his killing while engaging in a con-

C.

The defendants also raise a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), that the government failed to turn over material exculpatory evidence prior to trial. In particular, the defendants argue that the government failed to disclose, until the trial was underway, a number of statements by various witnesses. The defendants also argue that the prosecution has never disclosed certain other pieces of information. To establish a due process violation based on the prosecution's failure to disclose information, a defendant must show that: "(1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the state, whether willfully or inadvertently; and (3) it must be material." *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 555 (4th Cir. 1999). Evidence is deemed material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). The materiality of "suppressed evidence [must be] considered collectively, not item by item." *Kyles v. Whitley*, 514 U.S. 419, 436 (1995).

We first consider two pretrial statements by eyewitnesses to the Greer shooting who testified at trial. The first is a statement by Sharon Gordon, then a student at Johns Hopkins, who was sitting in her car at a red light several cars behind Greer when he was shot. Although she witnessed the shooting, she did not get a good look at the shooter and her description of him at trial was very vague. She never identified Burrell (or anybody else) as the shooter, either to the police or at trial. The defendants object to the prosecution's failure to disclose, prior to trial, Gordon's pretrial statement. However, Gordon did not identify Burrell at trial, and the defendants do not suggest that

---

spiracy count. It states that upon re-sentencing on the drug conspiracy count, the district court presumably will find that Burrell committed a murder in furtherance of the conspiracy, a sentencing factor which will result in him receiving the same sentence — life — that he is currently facing for both counts combined. We draw no conclusions regarding the accuracy of the government's presumptions about Burrell's resentencing. We also note that our decision is entirely unaffected by whatever sentence Burrell may ultimately face.

she identified some other person in this pretrial statement. We conclude that the defendants have not identified anything in Gordon's pretrial statement rendering that statement exculpatory. Moreover, Gordon's pretrial statement was disclosed to defense counsel, albeit at trial rather than beforehand.

The second witness statement is by Darren Frazier, a security guard at Johns Hopkins who also witnessed the Greer shooting. The defendants complain that the government did not disclose until midway through the trial some notes taken by an investigator during an interview with Frazier. According to these notes, Frazier identified the shooter as a black male aged 33-34 who was 6'3" and weighed 225 pounds. Burrell, in contrast, is around 5'10" and has an average build. Like Gordon, Frazier did not make an in-court identification of Burrell as the shooter. If Frazier had changed his story at trial — either by omitting these details, which tend to exculpate Burrell, or by modifying them so as to match Burrell's description — then his prior inconsistent description would certainly have been *Brady* material that the government was obliged to disclose. However, at trial Frazier testified on direct examination by the prosecutor that the shooter was a black male, "approximately six two, six three in height, he weighed about maybe 220, 230 pounds." Thus, his testimony at trial exactly matched his pretrial statement. The defendants have not explained how their earlier knowledge of this information, which was introduced at trial, could possibly have aided their case.

Third, the defendants point out that the government failed to turn over, until voir dire, a statement by Rashida Teombe. Teombe's statement included the comment that "Hymie [Tony Allen] is right hand man of Poopy [Addison], [so Hymie] may have shot Antwan." The defendants argue that they could have investigated this alternate possibility if the government had provided this statement earlier in the proceedings. We do not find this persuasive. The government correctly observes that this statement is sheer speculation — Teombe was not a member of the drug conspiracy herself, and her statement provides no details suggesting some concrete factual basis for this conjecture. Nor has the defense suggested that any subsequent investigation into this supposed "alternate theory" has yielded any relevant information.

Fourth, the prosecution provided only redacted copies of state-ments by a number of other witnesses.[11] The defense has never been provided unredacted copies of these statements, but asserts that the unredacted areas might contain exculpatory information. Essentially, this argument amounts to saying that *Brady* requires the prosecution to hand over *everything* in its possession, either to the court or to defense counsel, for an independent determination of whether it is exculpatory and material. This runs directly contrary to the holding in *Brady*, which "clearly place[s] responsibility on the *prosecutor*, rather than the trial judge [or defense counsel], to determine" what material is exculpatory and must be produced under *Brady*. *United States v. Garrett*, 238 F.3d 293, 303 n.4 (5th Cir. 2000).

Fifth, the defendants point to the prosecution's failure to provide the statement of Billy Ray Kirk until the second week of trial. The government had listed Kirk as a witness, but in the end did not call him. According to the defendants, Kirk's statement indicates that the Snider killing was in self-defense — that Snider shot at Burrell first. Defense counsel's theory of the Snider killing was that it was simply an act of self-defense and was unrelated to the conspiracy. The prose-cution, on the other hand, presented the Snider murder as another overt act in furtherance of the conspiracy. Defense counsel did pre-sent other evidence that the murder was in self-defense. Several bullet holes had been fired *into* the car that Burrell was driving at the time, and other witnesses testified that Snider shot first. Accordingly, the Kirk statement is cumulative of other evidence at trial. Moreover, proving that Burrell returned fire after being shot at first by Snider does *not*, as defense counsel seems to assume, prove unequivocally that the Snider killing was not in furtherance of the drug conspiracy. Evidence that Burrell was returning fire might weaken the inference that he shot Snider to further the conspiracy, but countervailing evi-dence — such as testimony that Addison had ordered Burrell to kill Snider — still permitted a reasonable jury to find that Burrell was intent on shooting Snider as part of the ongoing drug war, regardless of who had initiated the shooting.

---

[11]Specifically, these witnesses are Bruce Snider, Charles Adock, Mary Washington, Sharon Calloway, George Jones and an unknown witness.

Finally, the defendants argue that the government should have turned over the identity of a confidential informant who provided information for search warrants for properties used by Addison and other gang members. In response, the government cites "the well settled principle that the government is permitted to withhold the identity of a confidential informant when the informant was used only for the limited purpose of obtaining a search warrant." *United States v. Gray*, 47 F.3d 1359, 1365 (4th Cir. 1995) (quotations omitted). Because the confidential informant was used solely to obtain a search warrant and not at trial, the government had no duty to disclose his identity.

Considering all of these allegations together, we conclude that the delay in the disclosure of the evidence by the prosecution was not material to the outcome of the case. As noted above, only one statement — that of Rashida Teombe — might have required some investigation by the defendants. That statement was unfounded speculation, and the defendants have not presented any relevant evidence revealed by this statement. The remaining statements are descriptions that do not precisely identify Burrell and testimony that is cumulative of other evidence presented. Defense counsel had ample opportunity to introduce these statements at trial, and the defendants have not demonstrated how earlier access to these materials would have meaningfully improved their defense. As to the non-disclosed materials, the defendants have not shown that the prosecution had any duty to turn over these materials. In sum, the defendants have fallen far short of establishing that if this material had been disclosed earlier in the proceedings, "there is a reasonable probability that . . . the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

D.

Both Addison and Burrell argue that their convictions must be overturned because the government knowingly offered false testimony against them. We reject this contention, because both alleged instances of false testimony simply involve inconsistencies in the testimony of government witnesses. As we have stated before, "[m]ere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987) (citation omitted).

The first allegedly false statement involves testimony by Brandon relating to the Greer and Snider murders. As set out in the statement of facts, Brandon testified that Addison had told him that he (Addison) had ordered the Greer and Snider murders. On direct, Brandon testified that Addison had told him of the Greer and Snider killing prior to Brandon's incarceration in April of 1996. On cross-examination, defense counsel brought out that the murders in question happened in May and June of 1996. This, of course, is inconsistent with Brandon's testimony that Addison told him about the murders prior to April of that year.[12] When confronted with this inconsistency, Brandon explained that he was still in contact with Addison after he got out of jail and that Addison must have told him about the murders then. Clearly this testimony is somewhat inconsistent — Brandon revised his timetable to make sense of his testimony. The record illustrates that defense counsel effectively brought out this inconsistency on cross-examination and made hay of it in closing argument. This is a far cry from establishing that Brandon's testimony was in fact false or that the government knew that the testimony was false.

As for the second allegedly false statement, McLeod testified that Addison approached him at the Chapel Hill Gang's Spendthrift Circle apartment on the day after Greer's murder and asked for money so that Burrell could "lay low." Defense counsel confronted McLeod with the facts that (1) Addison was hospitalized in critical condition on the day that Greer was killed, and (2) the lease on the apartment in question had run out in May of 1996 (the Greer killing was in June). McLeod then changed his story and testified that Addison must have approached him about the earlier Snider murder. Again, the government made much of this inconsistency on cross-examination and in closing argument. But this inconsistency does not prove that the government knew that McLeod's testimony was false. *See, e.g.*, *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002) (witness statements that an officer was carrying a wooden rather than metal baton was not knowingly false even though the government had a report signed by the witness indicating that the officer was carrying metal baton). Because the defendants have failed to establish that the

---

[12]The testimony was that Addison claimed responsibility for past murders, not future murders.

testimony presented by the government was false, let alone that the government knew it was false, this claim is without merit.

E.

Burrell next argues that the district court committed plain error by failing to properly instruct the jury on all elements of conspiracy. He concedes that he failed to object to the court's instruction on this ground at trial, and thus we review the court's instructions for plain error. Under the plain error standard set out in *United States v. Olano*, 507 U.S. 725, 732-36 (1993), the defendant must demonstrate "(1) there is an error (2) that is plain and (3) that affects substantial rights." *United States v. Carr*, 303 F.3d 539, 543 (4th Cir. 2002). "'If all three [of these] conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997) (quotations omitted)).

Burrell emphasizes the difference between the district court's instructions, which made reference to two elements of conspiracy, and the standard from *United States v. Stewart*, 256 F.3d 231 (4th Cir. 2001), which lists four elements of conspiracy. This court in *Stewart* stated that: "To prove a drug conspiracy, the Government must prove the following: (1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and (4) interdependence among the alleged conspirators." *Id.* at 250 (quotations and citation omitted). The district court began its instructions by explaining that to establish a conspiracy, the government must prove "two elements beyond a reasonable doubt. First, that the alleged conspiracy existed. Second, that the charged defendant knowingly and intentionally became a member of the conspiracy."

On their face, these instructions do not precisely mimic the four elements articulated in *Stewart*.[13] Still, there are at least two funda-

---

[13]It is worth noting that this case was tried in the spring of 2000, while *Stewart*, the first case in which this court used this particular four-element standard for conspiracy, was decided in 2001. It would therefore have been quite an act of prescience on the part of the district court to have precisely anticipated the formulation used in *Stewart*.

mental flaws in Burrell's argument. First, while *Stewart* is certainly one correct statement of the elements of conspiracy, it is by no means the only formulation that captures those essential elements. Other cases have articulated a three-prong test for conspiracy. For example, in *Burgos*, this court explained that "[t]o prove conspiracy to possess cocaine base with intent to distribute, the Government must establish that: (1) an agreement to possess cocaine with intent to distribute existed between two or more persons; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of this conspiracy." *Burgos*, 94 F.3d at 857 (citation omitted). *Stewart* is not inconsistent with *Burgos* because the former articulates the elements of conspiracy using four prongs while the latter does so with three prongs.[14] They are simply two equally correct formulations of the same basic elements of conspiracy. Accordingly, the discrepancy between the reference to the "two elements" of conspiracy in the jury instructions and the four elements listed in *Stewart* does not mean that the instructions were inadequate.

Second, and more importantly, the jury instructions given here explain the meaning of these "two elements" in a manner that adequately covers all of the requirements set forth in *Stewart*. The district court defined conspiracy as "a combination, or a mutual agreement by two or more persons, to disobey or disregard the law." The court then explained that if the jury concluded that a conspiracy existed, "you should next determine whether or not the defendant whom you are considering willfully became a member of the conspiracy." In deciding this,

> [Y]ou should consider whether . . . the defendant knowingly and willfully joined the conspiracy. Did he participate in it with *knowledge* of its unlawful purpose with *specific intention of furthering* its business or objective as an associate or as a worker? In that regard, it has been said that in order for a defendant to be deemed a participant in a conspiracy, that he must have had a stake in the venture or its outcome. . . . [I]n sum, a defendant with an understanding of the unlawful character of the conspiracy must have intentionally engaged

---

[14]In fact, both opinions were authored by the same judge, Judge Williams.

> or advised or assisted in for the purpose of furthering the
> illegal undertaking, and he thereby becomes a knowing and
> willing participant in the unlawful agreement; that is to say,
> a conspirator.

(Emphasis added.) These detailed instructions make clear that the sec-
ond "element" — that the defendant knowingly and intentionally
became a member of the conspiracy — requires a finding that the
defendant knowingly assisted the conspiracy with the intent to further
its illegal goals. All in all, we conclude that the district court ade-
quately instructed the jury on all of the essential elements of conspir-
acy. We find no error in the instructions, let alone plain error.

F.

The defendants next argue that both the indictment and the jury
instructions were flawed, as neither clarified that a "substantial con-
nection" must be established between the conspiracy and the alleged
murders. The defendants also argue that the prosecution exacerbated
this error by making improper comments in closing argument. We
first consider the indictment. Counts Two and Three of the indictment
charge killings "while engaging in" a drug conspiracy, in violation of
21 U.S.C. § 848(e). The phrase "while engaging in" is taken directly
from the statute. Nonetheless, as the defendants correctly point out,
this phrase on its own fails to adequately convey the elements of a
§ 848(e) offense. The phrase "while engaging in" could be read to
require no more than a temporal connection between a killing and
participation in a drug conspiracy. Thus, this court, like others, has
made clear that under § 848(e), "a substantive connection [between
the killing and the underlying offense] must be implied as an essential
element of § 848(e)." *United States v. Tipton*, 90 F.3d 861, 887 n.13
(4th Cir. 1996) (citing *United States v. Chandler*, 996 F.2d 1073,
1097 (11th Cir. 1993)). In this case, Counts Two and Three simply
allege that the defendants, "while engaging in . . . conspiracy to dis-
tribute . . . cocaine, . . . intentionally killed" Antwan Greer (Count
Two) and Bernard Miller (Count Three).

In response, the government points out that both Counts Two and
Three incorporate by reference all allegations from Count One. In
Count One, the drug conspiracy count, the government specifically

alleges that (1) the defendants "acted as enforcers who would retaliate against persons who threatened the group's territory or who injured or threatened members of the group[;]" (2) "in connection with his role as an enforcer, Darrell Antonio Burrell . . . murdered Silvester Snider[;]" (3) Burrell "murdered Antwan Greer on June 12, 1996, in retaliation for the shooting of Andre Addison[;]" and (4) "in connection with their roles as enforcers, [Ray and another man] participated in the murder of Bernard Miller . . . in retaliation for an attack by members of the Jefferson Street Boys." The government argues that this language more than adequately alleges, by way of particular facts, a substantial connection between the killings in Counts Two and Three and the drug conspiracy. We agree. The government need not use magic words to convey the required connection between the drug conspiracy and the killings. As in *Chandler*, "any reasonable reading of the indictment makes it clear that the government was charging [the defendants] with a murder in connection with, and not just contemporaneous to, the ongoing" conspiracy. *Chandler*, 996 F.2d at 1097. We conclude that the indictment adequately alleged a substantial connection between the killings and the drug conspiracy.

We now turn to the defendants' analogous argument directed at the jury instructions. In this regard, any contention that the instructions failed to require the jury to find a "substantial connection" can easily be rebutted by simply quoting from the instructions. The judge instructed, in pertinent part, that:

> The government must prove that such killing occurred while the defendant engaged in the conspiracy charged in count one. The term "while engaging in" means more than coincidence in time with the conspiracy. . . . [It] requires not only that the crime occur during the time period covered by the conspiracy, but also that each individual defendant's participation be related to the conspiracy. You may find that the killing was related to the conspiracy if you find that there was a substantive connection between the individual defendant's role in the killing and his participation in the conspiracy.

This instruction adequately conveys the necessary nexus between the killing and the conspiracy and eliminates any danger that "a defendant

could be found guilty simply on the basis of a temporal coincidence of a murder with a [conspiracy]." *Tipton*, 90 F.3d at 887. The defendants' contention in this regard is without merit.

Finally, we address certain comments by the prosecutor in closing argument. These comments, the defendants contend, led the jury to believe that the connection between the killings and the drug conspiracy was unimportant. In closing, the prosecutor highlighted the defense argument "that somehow this is not a federal case." The prosecutor then stated:

> I don't know what that means, this is not a federal case. . . . All I know is that this is a case that involves interstate commerce of kilos of cocaine, that there are killings, that there are guns, that there are drugs, and that there are murders. . . . You tell the mothers of Antwan Greer and Bernard Miller that this is not a federal case. If this is not a federal case, ladies and gentlemen, I don't know what is. I don't know what is.

By these statements, the prosecution appears to be suggesting that any case that involves guns, drugs, and killings is necessarily a federal case, *i.e.*, a violation of federal law. This is quite obviously incorrect. As should be clear from our discussion of Ray's conviction in part II.A.1, the question of whether Ray is guilty of a federal crime or only a state crime, which the prosecution here paints as an irrelevant technicality, is *the* central issue for Ray.

In addition, the prosecutor's comment regarding the murder victims' mothers is particularly inappropriate. It suggests that determining whether certain conduct gives rise to "a federal case" depends on the severity of the crime or the suffering of the victim's families. It also implies that a state murder conviction would somehow inadequately capture the seriousness of the defendants' conduct. Nothing could be further from the truth. It is a "truism that our federal system entrusts the States with primary responsibility in the criminal area," *Giles v. Maryland*, 386 U.S. 66, 81 (1967), and any suggestion that the States are inadequate to the task is unfounded and irresponsible. The government concedes, as it should, that this argument was inappropriate.

Nonetheless, while the remarks were improper, "[t]he issue . . . is whether those remarks materially affected the verdict." *United States v. Loayza*, 107 F.3d 257, 262 (4th Cir. 1997). Materiality depends on "first, whether the comments misled the jury and prejudiced the appellant; second, were they isolated or extensive; third, absent the remarks, what was the weight of the evidence against the accused; and fourth, were the prosecutor's remarks deliberate." *Id.* (citations omitted). In this case, the prosecutor's remarks were isolated in the course of a month-long trial. The evidence connecting Addison's and Burrell's participation in the Greer and Snider killings to the drug conspiracy was quite strong. Given the district court's clear jury instructions, it is unlikely that these isolated comments misled the jury. We conclude that the improper remarks did not materially affect the jury's verdict against Burrell or Addison. We reject all of the defendants' contentions related to the "substantial connection" between the killings and the drug conspiracy.

G.

The defendants next object to the admission of evidence resulting from a search warrant. The copies of the warrant and affidavit introduced to the district court at the suppression hearing were not signed by a magistrate or by the affiant, respectively. The brief submitted by defense counsel on appeal does not make clear whether the defendants claim that the search warrants were never actually signed, or whether they merely claim that the failure to introduce signed copies of the search warrants at the suppression hearing was reversible error. Addison requested permission from this court to file a supplemental *pro se* brief on this issue, which we granted. In his *pro se* brief, Addison contends that the warrants in question had never been signed by any magistrate. The government responded to the initial defendants' brief but did not respond to Addison's *pro se* brief. The government stated that "[t]he fact that the search warrant and affidavit were unsigned is not relevant" to the Fourth Amendment probable cause inquiry. In its brief, the government never expressly stated that the original warrant and affidavit had actually been signed, nor did they proffer copies of the original, signed warrant and affidavit.[15]

---

[15]This is perhaps because the defendants' brief did not clearly allege that the originals had never been signed. But Addison's *pro se* brief,

When pressed at oral argument, the government represented that the original warrant and affidavit had in fact been signed. After a specific request by the court, the government provided copies of the original signed warrant and affidavit. Addison has not responded or attempted to draw into question the authenticity of those documents, and we reject his contention that the search warrant and affidavit were never in fact presented to a magistrate or signed.

Given the fact that the search warrant and affidavit had in fact been signed, we also reject the defendants' lesser contention that the evidence must be suppressed because unsigned *copies* of the warrant and affidavit were introduced at the suppression hearing. In *United States v. Lipford*, 203 F.3d 259 (4th Cir. 2000), this court held that the fact that a police officer had provided a defendant with an unsigned copy of a search warrant, when the original had in fact been signed, did not require suppression of the evidence obtained in that search. *Id.* at 269-70. We explained that "this was, at most, a technical violation of Federal Rule of Criminal Procedure 41(d), and not a violation of the Fourth Amendment. Absent a demonstration of prejudice or bad faith — neither of which is present here — suppression of evidence is not the proper remedy . . . ." *Id.* at 270. The same rule applies here. Because a magistrate actually issued the search warrant, the fact that an unsigned copy was introduced at the suppression hearing is, as in *Lipford*, a technicality that does not call for suppression of the evidence.

### H.

The defendants also argue that the district court erred by refusing to sever the trials, by refusing to instruct the jury on the limited admissibility of a co-conspirator's statements, and by refusing to provide a requested multiple conspiracy instruction. We have reviewed these claims and conclude that the district court did not abuse its discretion in any of these matters. *See United States v. Akinkoye*, 185

---

which we permitted him to file, does make this more serious allegation. We are troubled by the government's failure to make any response to this serious allegation, particularly given the simplicity of Addison's claim and the ease of presenting the proof required to rebut it — namely, copies of the original signed documents.

F.3d 192, 197 (4th Cir. 1999) (refusal to sever); *United States v. Mancuso*, 42 F.3d 836, 843 (4th Cir. 1994) (refusal to provide instructions). Additionally, the defendants raise various challenges related to the Snider killing. Specifically, the defendants argue that the district court committed error in admitting evidence of this unindicted killing, in refusing to instruct on self-defense, and in permitting improper closing argument related to this killing. We have reviewed these contentions and conclude that they lack merit.

### III.

In sum, we conclude that the vast majority of the defendants' claims on appeal lack merit. We do conclude, however, that the government failed to present sufficient evidence from which a jury could find, beyond a reasonable doubt, that Ray participated in the Miller shooting in order to further the drug conspiracy. We therefore reverse his conviction on both counts. We also conclude that Burrell was denied his statutory right to two attorneys for his death-eligible offense and that his conviction for killing while engaging in a drug conspiracy must therefore be vacated. This error does not affect his conviction for conspiracy to distribute cocaine, however, and we affirm that conviction. We vacate his sentence and remand for resentencing on that count alone. We affirm Addison's conviction in all respects.

*AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED*