# United States Court of Appeals
## For the First Circuit

No. 13-2447

UNITED STATES,

Appellee,

v.

JAMES J. BULGER,
a/k/a Jimmy, a/k/a Whitey, a/k/a Jim,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Thompson, Kayatta, and Barron,
Circuit Judges.

Henry B. Brennan, with whom James H. Budreau was on brief,
for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom
Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

March 4, 2016

**THOMPSON**, **Circuit Judge.** After evading authorities for fifteen-plus years, fugitive James "Whitey" Bulger, the head of an organized crime syndicate in Boston from the 1970's to the 1990's, was captured. Bulger, who had been indicted in connection with a racketeering conspiracy while on the run, was brought to trial. The jury found him guilty of the vast majority of charged crimes and he was sentenced to life in prison. Bulger appeals the conviction, claiming that he was deprived of his right to a fair trial when both the government and trial court got a few things wrong prior to and during trial. Having closely considered the array of claimed errors, we affirm.

## I. BACKGROUND

The factual underpinning of this case is considerable. The events span decades and the cast of characters is large but this appeal is circumscribed in scope making only certain details pertinent. We chart the relevant origin and travel of the case, saving the facts related to the maintained errors for later.[1]

### A. The Indictment

In 2001, Bulger, who was on the run and had been for some time, was charged with thirty-two counts of a racketeering

---

[1] Bulger does not lodge a sufficiency of the evidence challenge. Rather his grievance relates to various evidentiary issues and, so, we present a more neutral summary of the facts up front, adjusting our approach as needed later. United States v. Flores-Rivera, 787 F.3d 1, 9 (1st Cir. 2015).

indictment along with Stephen Flemmi.[2]  It alleged that Bulger and Flemmi were members of a criminal organization known as Winter Hill (or some variation on this moniker) and part of a racketeering conspiracy that extended from around 1972 to 2000 in South Boston. Bulger, it said, participated in multiple racketeering acts, including nineteen murders, extortion, narcotics distribution, and money laundering.[3]  There were also an assortment of weapons charges, e.g., possession of firearms and machineguns in furtherance of a violent crime, possession of unregistered machineguns, and transfer and possession of machineguns.

**B. Arrest and Trial**

Law enforcement finally caught up with Bulger in June of 2011, finding him living under an assumed identity in California.  He was arrested and from there brought back to Massachusetts to stand trial.

There was a good deal of pretrial skirmishing among the parties and rulings from the court, the particulars of which we will detail later.  The same goes for the midtrial clashes and edicts.  We will chronicle those later too.  For now we focus on

---

[2] Flemmi's brother, Michael Flemmi, was also charged.  Michael was said to have provided unlawful assistance to his brother and other gang members at various points, e.g., obstruction of justice and weapons possession.

[3] The racketeering count alleged thirty-three underlying racketeering acts.  Some acts were charged as a conspiracy, some acts as stand-alone substantive charges, and some as both.

- 3 -

the substantive case that was presented to the jury over the course of the three-month trial.

### C. The Government's Case

The government called scores of witnesses: participants in Bulger's operations, law enforcement officials, and forensics experts. Some of the testimony came from Bulger's closest Winter Hill associates -- Flemmi, John Martorano, and Kevin Weeks -- who had all cut plea deals with the government, swapping their cooperation for various benefits. The jury heard the following.

The government placed the start of the conspiracy at a 1972 meeting where Bulger's gang and another gang decided to go in together on some kind of "gambling business" that targeted individuals not affiliated with the mafia (also known as New England La Cosa Nostra). A string of murders followed in the ensuing years, which testimony linked Bulger to, along with other criminal activities.

Then around 1975, according to government witnesses, Bulger began acting as an informant to John Connolly, a Federal Bureau of Investigation ("FBI") agent. At some point, their relationship turned corrupt. Martorano and Flemmi (the latter, by his own admission, had been an FBI informant dating back to the 1960's), testified that Connolly began alerting Bulger to investigations being made into Winter Hill's illegal conduct and Bulger, in turn,

lavished Connolly with gifts and cash, with approximately $230,000-plus going to Connolly over the years.[4]

For Bulger and his cohorts, the 1980's brought more murders and the continued use of violence to extort large sums of money from individuals. There were also a couple newer ventures: shaking down drug dealers for a share of their profits and purchasing real estate utilizing illegally obtained money.

The enterprise began to crumble in the summer of 1990 when law enforcement arrested some individuals involved in Winter Hill's drug venture. Fast forward a few years to 1994 when, according to cohort Weeks, he was approached by Connolly who informed him that indictments for Bulger and Flemmi "were imminent." Weeks passed on the message to both. Bulger took heed and fled, and after some short-term stops in New York and Chicago, ended up in Santa Monica, California, where he remained until his June 2011 arrest.

For his part, Flemmi stuck around and indeed was arrested in January of 1995. He tried to avoid being prosecuted, arguing during pretrial proceedings that he had been a secret FBI informant and so was immune from prosecution. With the courts holding otherwise, See United States v. Salemme, 91 F. Supp. 2d 141 (D.

---

[4] Connolly was not the only compromised public official. According to the testimony, Winter Hill had similar quid pro quo arrangements with other corrupt law enforcement officers.

Mass 1999); United States v. Flemmi, 225 F.3d 78 (1st Cir. 2000), Flemmi agreed to cooperate with the government. In 2003, Flemmi pled guilty to twelve murders, extortion, narcotics crimes, money laundering, obstruction of justice, perjury, and firearms charges. By the time of Bulger's 2013 trial, Flemmi was serving a federal life sentence, as well as life sentences in Oklahoma and Florida. Because of his agreement to assist the government, Flemmi avoided the death penalty in those two states and got placed in a Federal Bureau of Prisons segregated unit for government witnesses (according to Flemmi, the living conditions are better there than in general population).

Like Flemmi, Martorano was arrested in January of 1995. Martorano, who had been a fugitive since 1979, was picked up down in Florida. He pled guilty to various federal charges, including ten federal murders, as well as two state murders. In exchange for cooperating against Bulger (if apprehended) and Flemmi, Martorano got just a fourteen-year sentence, to be served in a special facility for government witnesses, with five years' supervised release. On top of that, Martorano was allowed to use property seized by the government to settle a judgment his ex-wife had secured against him. He was released from prison in 2007.

Weeks was arrested in November of 1999 by the Drug Enforcement Agency and Massachusetts State Police. He pled guilty to racketeering crimes plus five murders, and received immunity for

some state crimes, in exchange for his full cooperation.  The plea terms required him to testify in any case that was pending or brought within three years of his plea agreement.  Bulger's trial marked the fifth or sixth trial that Weeks took the stand for.

As for Connolly, Bulger's FBI handler, he was indicted in 1995 (along with Bulger, Flemmi, and Martorano) for the murder of a businessman that Winter Hill had dealings with.  Connolly was convicted by a jury some years later.  At the time of Bulger's trial, Connolly was serving his sentence down in Florida, after having also been convicted of some federal charges in Massachusetts stemming from his relationship with Winter Hill.

### D. The Defense

Bulger's defense strategy was laid out during opening statements.  It was not a wholesale denial of any criminal wrongdoing.  Instead counsel tried to poke holes in the government's case by casting doubt on the veracity of the cooperating witnesses' testimony, namely Flemmi, Martorano and Weeks.  The defense harped on their background and character, as well as "the unbelievable incentives the prosecution has given these three men so that they will testify in the manner that the government wants."  It also sought to undercut the prosecution's case by emphasizing the rampant corruption among federal law enforcement at the time.  And counsel vigorously disputed the notion that Bulger had been an informant, instead claiming that he

paid Connolly and other law enforcement members large sums of money in exchange for information meant to ensure the continued productivity of his criminal enterprise.

These themes continued through the defense's cross-examination of government witnesses and direct examination of its own witnesses, namely law enforcement agents. Bulger did not take the stand.

### E. The Verdict and Sentence

Eventually both sides wrapped up and after deliberating for four days, the jury found Bulger guilty on all counts, save one extortion count. With respect to the racketeering count in particular, the jury found the government had proven some, though not all, of the thirty-three racketeering acts alleged. The proven ones included the murder of (and sometimes also the conspiracy to murder) eleven individuals, multiple instances of extortion and money laundering, and one act of narcotics distribution conspiracy. Following a hearing, the trial judge sentenced Bulger to life in prison, with an additional life and five-year sentence to be served consecutively.

### F. This Appeal

Bulger timely appealed. As alluded to above, he assigns error to various court rulings and condemns certain actions of the government. Bulger would have us find that standing alone, or

cumulatively, the alleged miscues warrant reversal of his conviction and a new trial.

## II. IMMUNITY

Bulger's first claimed error relates to the court's pretrial decision that barred Bulger from asserting at trial that he was immune from prosecution, immunity, Bulger says, he was granted long ago by a government attorney, one Jeremiah O'Sullivan. We start with what happened below.

### A. Background

Prior to trial, the defense filed a discovery motion seeking all correspondence between various law enforcement agencies, e.g., FBI, United States Attorney's Office, Department of Justice ("DOJ"), and individual Winter Hill members, such as, Bulger, Flemmi, and Martorano. As grounds for the request, Bulger indicated that he "intend[ed] to show at trial that [he] had immunity for the indicted conduct." Specifically, he claimed that now-deceased former federal prosecutor, Jeremiah O'Sullivan, who previously headed the DOJ's New England Organized Crime Strike Force, promised Bulger that he would not be prosecuted for his crimes.

The government opposed the request, calling the immunity claim "frivolous and absurd," and asked the court to decide pretrial that Bulger did not have an enforceable immunity agreement with the government. In additional briefing, the government

produced an affidavit from Associate Deputy Attorney General David Margolis, who, in his capacity as Chief of the DOJ's Organized Crime and Racketeering Section during O'Sullivan's tenure, had been responsible for supervising O'Sullivan. Boiled down, the affidavit said that O'Sullivan would not have had the authority to confer immunity on Bulger. Margolis explained that certain approval practices adhered to non-prosecution agreements and grants of use immunity, and that O'Sullivan had never discussed with him (or his deputies) the prospect of any agreement with Bulger, nor sought the required authorization to enter into such an agreement. Margolis stated that "if O'Sullivan did, in fact, enter into any immunity or non-prosecution agreement with James Bulger without obtaining the proper approvals, O'Sullivan would have acted beyond the scope of his authority." The same went for any purported agreement with O'Sullivan that contemplated immunity for future violent criminal conduct, a concept Margolis deemed "foreign."

The court (a different judge from the trial judge was presiding over the case back then), after conducting a hearing, ruled on the issue in March 2013. It found that pretrial resolution of the immunity claim was warranted, and that Bulger's claim of immunity for any crimes prospective to the grant (i.e., crimes that Bulger committed after O'Sullivan's purported promise) was without authority and unenforceable. The court ordered

supplemental briefing on the issue of historical immunity (i.e., crimes committed before the alleged immunity promise) so that Bulger could properly respond to the recently produced Margolis affidavit. The parties were also given the opportunity to request an evidentiary hearing.

When the judge who made the initial ruling ended up recusing from the case, and the ultimate trial judge took over, Bulger moved to vacate the March 2013 order.[5] After hearing argument, the court issued its decision. Though it found no reason to vacate the original order, it nonetheless decided to revisit the issues the order had dealt with.

First, the court found that whether or not a valid immunity agreement existed was indeed an issue for a judge's consideration, as opposed to a jury's, for a few reasons. For one, it held that immunity was a bar to prosecution that needed to be decided by the court beforehand, as opposed to a defense that might go to the jury. The court also concluded that the question of immunity was entirely severable from the issue of whether Bulger was guilty or

---

[5] The original judge was Judge Richard Stearns, whom Bulger petitioned to have recused given the judge's background in federal prosecution during the time period at issue in this case. This court granted that petition. In re Bulger, 710 F.3d 42 (1st Cir. 2013). To be clear, this court did not find (and there was no claim) that Judge Stearns was actually biased. Id. at 46, 49. Rather, this court concluded that "a reasonable person might question the judge's ability to preserve impartiality." Id. at 49. The ultimate trial judge, Judge Denise Casper, was assigned to take over.

innocent of the charged crimes.  Plus, deciding the issue pretrial would either narrow the focus at trial, or, in the event things went the other way, prevent an unnecessary trial.

As for the merits of Bulger's immunity claim, the court found that Bulger had offered only a bare assertion (through defense counsel's representations) that O'Sullivan gave him immunity sometime before 1984, which extended until 1989 when O'Sullivan left the United States Attorney's Office.  Bulger provided no evidentiary support, written or otherwise, for this claim and declined the court's invitation for an evidentiary hearing.  This was inadequate, the court concluded.  It stated that there was an "insufficient proffer that any such promise of immunity was made by a person with actual authority to make it or that Bulger detrimentally relied upon such a promise, or that any such agreement was enforceable as a matter of law."[6]

---

[6] On appeal, Bulger suggests that the trial judge mistakenly assumed he intended to assert an all-or-nothing immunity defense for the charged crimes, and, according to Bulger, he "never made such a claim."  The record belies this.  The trial judge, in the written decision, wrote: "Bulger contends that O'Sullivan gave him immunity from prosecution of crimes in this district and that this agreement was entered into sometime before December 1984 and ended in 1989."  This is a completely accurate characterization.  In his brief to the trial court, Bulger alleged that the immunity agreement "bars federal prosecution of the defendant in the District of Massachusetts," and the "Dept. of Justice is therefore barred from prosecuting the defendant for any crimes that occurred prior to 1989."  We do not see, and Bulger does not direct us to, any points below where he tried to pitch the matter to the court any differently.  And, of note, Bulger does not actually come out and say how he intended to argue immunity, if not in an all-or-

The court was also unpersuaded by Bulger's criticism of the distinction the previous judge made between historical and prospective immunity. According to Bulger (again this is just via counsel's arguments and representations), the historical versus prospective distinction made no sense because the grant of immunity was actually "ongoing," in other words it extended from the grant in 1984 until the end of O'Sullivan's tenure in 1989. The court saw things otherwise. It concluded that regardless of whether immunity was characterized as prospective, historical, or ongoing from its alleged grant, Bulger's proffer was insufficient.

Finally, the court disposed of Bulger's argument that his Sixth Amendment rights were being infringed by the court's preclusion of his immunity claim, and by extension any testimony in support thereof, since though restricted in his testimony, Bulger was not actually barred from taking the stand to offer pertinent and admissible testimony, and there is no constitutional right to introduce irrelevant evidence.

With the immunity issue decided, the case went to trial. Though not precluded from doing so, Bulger ultimately elected not to testify. When questioned by the judge at the close of the

nothing fashion. He vaguely alludes to his being charged with a lot of crimes, and the court's ruling preventing him from "presenting an immunity defense for some crimes and relying on the government's burden of proof beyond a reasonable doubt of others." In any event, Bulger's revisionist view of what happened below gets him nowhere.

defense's case about whether this election was voluntary, Bulger stated: "I'm making the choice involuntarily because . . . I feel that I've been choked off from having an opportunity to give an adequate defense and explain about my conversation and agreement with Jeremiah O'Sullivan.  For my protection of his life, in return, he promised to give immunity."  After further lamenting the court's decision and the "sham" trial he had received, Bulger ultimately confirmed that he had decided not to testify.

## B. Argument

On appeal, Bulger assigns error to the trial court's pretrial immunity ruling.  Broadly speaking (more to be said), Bulger argues that whether he had immunity was a question solely for the jury and should not have been taken up by the judge pretrial.  The judge's doing so, Bulger insists, ran afoul of both Federal Rule of Criminal Procedure 12 and the Constitution, specifically the protections the latter affords to an accused's rights to have a trial by jury, testify, present a defense, and not self-incriminate.[7]  In the alternative, even assuming this was a proper pretrial matter, Bulger claims that the judge decided it wrongly

---

[7] We will dig deeper into Rule 12's provisions later but for now it suffices to note that generally the rule sets forth the pleadings and pretrial motions procedures in criminal actions. Fed. R. Crim. P. 12.  On a side note, Rule 12 was amended in December 2014 but "[n]o change in meaning [was] intended."  Fed. R. Crim. P. 12(b)(1) advisory committee's notes to 2014 amendments. As a result, throughout this decision we cite to the 2013 version of the rule, which was in effect when this issue was decided below.

because his proffer as to the existence of an immunity agreement was sufficient.[8]  The government counters that immunity was

---

[8] Within his immunity argument, Bulger makes passing reference to what is, as best we can tell, a tag-along claim. He argues not only that the pretrial ruling was wrong but also that the court also should not have, later on in the proceedings, prohibited him from testifying about "immunity-related matters," i.e., his relationships with DOJ officials, including O'Sullivan.  Bulger does not flesh out this argument in his brief; what exactly he is talking about only became slightly clearer at oral argument.  He pointed us generally to a day toward the end of the government's case against him where Flemmi, in response to a question from the prosecutor, indicated that in connection with his own criminal proceedings he initially (and falsely) made some type of authorization or immunity claim.  Below, defense counsel zeroed in on this testimony, suggesting that since the prosecutor asked Flemmi about his prior claims of immunity, it somehow opened the door to Bulger taking the stand and being asked the same questions. The judge disagreed.  Bulger did not object to the ruling nor did he present a proffer as to what precisely he would have testified about.  See Fed. R. Evid. 103(a)(2); Fed. R. Crim. Proc. 51(b). Without a timely objection, we review Bulger's argument (charitably assuming it is crystalized enough) only for plain error.  United States v. Delgado-Marrero, 744 F.3d 167, 184 (1st Cir. 2014).

Below defense counsel offered no proffer of Bulger's anticipated testimony and did not in any meaningful way explain why the testimony had suddenly become relevant, for example to rebut the government's claim that Bulger was an informant as he now suggests to this court (to be clear, we are not saying that such an argument should have carried the day).  In light of the absence of any worthwhile offering from Bulger, it was reasonable for the trial court to conclude, as it did, that the proposed testimony would only be relevant insofar as it pertained to the issue of immunity.  Because the court had already precluded Bulger pretrial from raising the immunity issue, and for reasons we will get into this decision was correct, the court's decision not to allow the testimony can hardly be characterized as an error, plain or otherwise.  See United States v. Silva-Rosa, 275 F.3d 18, 23 (1st Cir. 2001) (finding no error in the court's exclusion of testimony that was only relevant to the necessity defense, which the court had already properly excluded).

correctly taken up pretrial and the judge properly, and without impinging on Bulger's rights, precluded Bulger's immunity claim based on an insufficient proffer.

## C. Judge vs. Jury

The first question is whether the judge was right to take up the immunity issue pretrial.  The short answer is yes.

For one, our across-the-board research suggests that resolving a defendant's claim that he is immune from prosecution pretrial, as opposed to at trial, is more the norm than the exception.  See United States v. McLaughlin, 957 F.2d 12, 15-16 (1st Cir. 1992) (affirming the trial court's pretrial denial of a motion to dismiss an indictment based on immunity); United States v. Silvestri, 790 F.2d 186, 193-94 (1st Cir. 1986) (same); see also United States v. Robertson, 736 F.3d 1317, 1321, 1324-25 (11th Cir. 2013) (same); United States v. Fishman, 645 F.3d 1175, 1184-85 (10th Cir. 2011) (same); United States v. Brimberry, 744 F.2d 580, 586 (7th Cir. 1984)  (holding that "[w]here a defendant contends that his or her prosecution is precluded by a grant of immunity, a motion to dismiss the indictment is the proper method of raising the issue").  And Bulger does not direct us to any case law that suggests otherwise.

What Bulger does contend, however, is that these cases are inapposite because they involve instances where the defendant sought to have the immunity issue decided pretrial, that is, moved

to dismiss the indictment.  Bulger claims that because he, unlike those defendants, did not affirmatively seek to have the immunity issue decided, it was inappropriate for the court to take up the issue at the government's behest.

For support, Bulger points us to Federal Rule of Criminal Procedure 12, which the government cited when it sought the pretrial ruling.  The rule provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue."  Fed. R. Crim. P. 12(b)(2).  Bulger claims that the plain language of this particular subsection, and the corresponding advisory note make clear that he can raise an immunity defense at trial without seeking pretrial resolution of the issue.  Bulger does not spell out why he believes this to be the case.  Our best guess is that he is drawing our attention to the permissive "may" in Rule 12(b)(2) and the corresponding note, which explains that matters falling under this provision may, at the defendant's option, be raised before trial but failure to do so does not constitute waiver.[9]  Fed. R. Crim. P. 12(b)(1), (2) advisory committee's notes to 1944 adoption.  But we fail to see how this is helpful to Bulger's cause.  That Bulger may raise immunity pretrial, and that

---

[9] The next sub-section of the rule sets forth motions that must be made before trial, which do not include motions related to immunity.  Fed. R. Crim. P. 12(b)(3).

his failure to do so won't waive the issue, does not necessarily mean that he and he alone can raise the issue, or that it was improper for the court to consider the government's in limine motion.

Not only does Bulger's argument make little sense but we see no legal support for his position. To start with, it bears noting that although Bulger did not file the actual motion seeking pretrial resolution, it was he who put the issue into play, indicating orally and in a filing before trial that "[t]he defense intends to show at trial that James Bulger had immunity for the indicted conduct." As a result, the government, as Rule 12 permits, requested that the court decide the issue pretrial. See Fed. R. Crim. P. 12(b)(2) ("A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue.") And immunity is specifically cited as an example of one of those issues that can be handled "without a trial of the general issue." Fed. R. Crim. P. 12(b)(1), (2) advisory committee's notes to 1944 adoption. It is logical for this to be so. Here, there was no need for a full jury determination as to Bulger's guilt or innocence because he argued that the immunity agreement barred his prosecution regardless of any culpability on his part.

Simply said, we fail to see why the fact that Bulger was not the one to file the motion or request the hearing, would

- 18 -

automatically convert this limited immunity matter to one for the jury.  Nothing in Rule 12 itself requires this reading.

Indeed it would make little sense for the trial judge here, when faced with Bulger's clear claim that he was barred from being prosecuted in the very courtroom in which he sat, to conduct a lengthy trial, only to have the jury potentially find that Bulger should not have been prosecuted in the first place.  A judge plainly "'should be alerted to the possible superfluity of the impending trial so that if the claim proves to have merit the time and effort of a trial might be saved.'"  Brimberry, 744 F.2d at 586 (alterations omitted) (quoting United States v. Buonomo, 441 F.2d 922, 924-25 (7th Cir. 1971)).

Furthermore, despite Bulger's protestation otherwise, judges can effectively make immunity determinations without usurping the jury's fact-finding role.[10]  For one, judges are outfitted to make factual findings (they of course do so regularly in varying contexts) and Rule 12 contemplates that some factual determinations might need to be made.  Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record.").  Secondly, our

_____

[10] Bulger suggests that there were outstanding issues of fact that should have been placed in the hands of a jury, namely whether he had immunity, whether O'Sullivan had the authority to grant it, and how far the immunity grant could extend.

case law suggests that immunity agreements are appropriate fodder for the court because, as we have explained in the context of an immunity-in-exchange-for-cooperation agreement, such agreements "are in the nature of contracts, their scope and effects are strongly influenced by contract law principles," and the defendant's rights under these agreements "are determined by the terms and conditions of the bargain as found by the court." McLaughlin, 957 F.2d at 16 (emphasis added); see also United States v. Dudden, 65 F.3d 1461, 1469 (9th Cir. 1995) (holding that the district court properly refused jury instructions "ask[ing] the jury to find whether an informal [immunity] agreement existed"); United States v. Gerant, 995 F.2d 505, 510 (4th Cir. 1993) (finding the defendant was not entitled to have a jury decide whether he breached a non-prosecution agreement because that issue "involves the right of the government to prosecute [the defendant] rather than [his] guilt or innocence").

All of this securely undermines the notion that the judge was wrong to consider immunity pretrial but a loose end remains. We are still left with Bulger's vague claim that the court's decision to take up immunity pretrial violated his constitutional rights, namely, his Fifth Amendment right not to incriminate himself, and his Sixth Amendment rights to have a trial by jury, present an effective defense, and testify. However, we decline to address these claims given that we think Bulger has a preservation problem,

which proves dispositive.  While Bulger points generally to some cases to support the unarguable notion that the constitutional rights he cites are important ones, he does not close the loop. He fails to provide us with intelligible analysis, or case law, to support his claim that the court's ruling in fact impinged on these rights.[11]

Of course "we consider waived arguments 'confusingly constructed and lacking in coherence.'"  Rodríguez v. Mun. of San Juan, 659 F.3d 168, 175 (1st Cir. 2011) (quoting United States v. Eirby, 515 F.3d 31, 36 n.4 (1st Cir. 2008)).  And constitutional claims like the ones Bulger lobs are just the type of complicated issues that call for some in depth treatment.  See Tayag v. Lahey Clinic Hosp., Inc., 632 F.3d 788, 792 (1st Cir. 2011) ("This is

---

[11] Bulger's most coherent constitutional argument is that, by requiring him to proffer evidence of the alleged immunity agreement pretrial, the court violated his Fifth Amendment right against self-incrimination.  Even were we to suppose this particular claim preserved, Bulger loses on the merits.  Bulger made this same claim below and the trial court disposed of it by invoking Simmons v. United States, 390 U.S. 377, 390 (1968), which the court read to bar the government's use of Bulger's potential pretrial statements at trial.  On appeal, Bulger says the court's offer of Simmons protection rang hollow given the potential derivative use of his testimony in other jurisdictions where he may have had criminal exposure.  We are confused, and consequently unpersuaded, by this contention.  Bulger's concern about the derivative use of any pretrial proffer does not square with his stated intent to testify in open court during trial about the very information the court asked for pretrial -- trial testimony which certainly could have been used later.

- 21 -

hardly a serious treatment of a complex issue and is not adequate to preserve the claim on appeal.").[12]

There is no need to say more.  With the immunity issue properly in the judge's hands, the only question that remains is whether she resolved it correctly.

## D. Merits

As we said, more typically a defendant who contends that an immunity grant bars his prosecution would move pretrial to dismiss the charges lodged against him.  See McLaughlin, 957 F.2d at 15; Silvestri, 790 F.2d at 193.  In instances where the trial court has denied the motion and allowed the case to proceed, appellate courts assessing a challenge to that ruling have reviewed the trial judge's factual determinations about the existence and scope of an immunity agreement for clear error.  United States v. Short, 387 F. App'x 308, 312 (4th Cir. 2010) (reviewing for clear error following the district court's denial of a motion to dismiss the indictment based on a grant of immunity); United States v. Meyer, 157 F.3d 1067, 1078 (7th Cir. 1998) (reviewing the trial court's factual determination regarding the scope of an immunity agreement for clear error); Silvestri, 790 F.2d at 193 (indicating that the

_____

[12] According to Bulger, the constitutional errors he alleges are structural in nature and, therefore, require automatic reversal rather than a harmless error analysis.  Because we ultimately find his arguments waived, and to the extent his Fifth Amendment claim is preserved, without merit, we do not need to delve into this issue.

existence of a plea agreement that purportedly conferred immunity on the defendant was a factual determination that could only be set aside if clearly erroneous). We will borrow a page from that playbook and do just that here. In doing so, we find that nothing in this record persuades us that the court clearly erred.

As we explained, the trial judge found the factual record did not establish that a legally enforceable promise of immunity was made by someone with authority to do so or that Bulger detrimentally relied on any such assurance. The court was not clearly wrong. There was in essence no proffer from Bulger. He did not offer, say by way of affidavit, particulars of the alleged grant, such as when and where it was given, whether anyone else was present, whether it was memorialized in some way, or whether consideration was exchanged. The same goes for why immunity was supposedly bestowed in the first place. Bulger did not proffer any evidence as to what benefit he heaped on the government in exchange for this extensive immunity grant.[13] Nor did Bulger make a plausible argument that O'Sullivan had actual authority to enter

---

[13] We are still hazy on the precise reason Bulger claims O'Sullivan purportedly gave him immunity. He has been vague on this point. For instance, in a discovery motion Bulger said the agreement was "in return for his assistance with a DOJ objective that did not include providing information about others" and that O'Sullivan "embraced" this objective. In his colloquy with the trial judge, regarding whether he was going to testify, Bulger said his protection of O'Sullivan's life was the impetus.

into the purported agreement.[14]  And as for whether Bulger relied to his detriment on the alleged promise, perhaps by doing something he would not have absent it, Bulger did not say one way or the other.  Instead the trial judge was left with a broad, bald assertion from defense counsel lacking any particularized details that Bulger entered into an immunity agreement with O'Sullivan sometime prior to 1984, which barred Bulger's federal prosecution in the District of Massachusetts.

Countering Bulger's rank assertion that he had been granted immunity, we had the government's Margolis affidavit (though to be clear the burden here is on Bulger, see Flemmi, 225 F.3d at 84), which unambiguously provided that even assuming the unlikely event of O'Sullivan entering into some agreement with Bulger, he would not have been authorized to do so.

Bulger tries to poke holes in the Margolis affidavit, and the government's position generally; however, he fails to convince. For one, we do not find persuasive Bulger's conclusory challenge to the DOJ regulations cited in the Margolis affidavit.[15]  The

---

[14] We need not decide whether the supposed immunity grant Bulger describes would have been valid if O'Sullivan had the authority to enter into it.

[15]  The affidavit cites to the DOJ's Principles of Federal Prosecution, the Handbook for Prosecution of Racketeers, the Guidelines on the FBI Use of Informants and Confidential Sources, and a memorandum titled Use of Informants in Domestic Security, Organized Crime, and Other Criminal Investigations.

regulations, broadly speaking, addressed how informants and cooperation agreements were handled in the department. Bulger says these were simply internal guidelines that did not have the force of law and were not binding on DOJ officials at the time of this case. How Bulger reaches these conclusions is not entirely clear. He briefly points us to both 28 U.S.C. § 547, which vests United States Attorneys with the power to prosecute, and he talks about the general notion "that the power to prosecute plainly includes the power not to prosecute." Flemmi, 225 F.3d at 87. These observations do not take Bulger far. That United States Attorneys have the general ability to enter into immunity agreements, hardly means that, one, O'Sullivan did so, two, that in this particular instance he had the hierarchal authority to do so or, more importantly, that Bulger came close to establishing either thing. Moreover, though internal DOJ regulations do not have the same force as the United States Code (a point we can all undoubtedly get on board with), that does not render the regulations inoperative or irrelevant to the inquiry we find ourselves engaged in and therefore they were appropriately factored into the mix below.[16]

---

[16] In cursory fashion, Bulger also says that the government's contention that O'Sullivan had no authority to bestow immunity is irreconcilable with findings this court made in United States v. Winter, 663 F.2d 1120 (1st Cir. 1981), abrogated on other grounds by Salinas v. United States, 522 U.S. 52 (1997). He claims that in Winter -- a race-fixing case involving some of Bulger's

Bulger's next contention is likewise unpersuasive.  He argues that the lack of any document memorializing the alleged immunity agreement -- a fact the Margolis affidavit briefly pointed out -- should have been given little weight by the trial court in light of the evidence showing that law enforcement, at the time, had a history of manipulating files and fabricating evidence.[17]  Even putting aside that the "evidence" he cites is a snippet of testimony that came out after the court's pretrial immunity ruling, and information that came out in other cases, the court below did not appear to give much weight to the fact that no actual document memorializing an immunity agreement ever turned up.  Certainly the lack of documentation was not stressed or highlighted in its analysis.  Rather the court focused on Bulger's failure to satisfy

_____

cohorts -- this court upheld an informal grant of immunity by O'Sullivan.  Notwithstanding the fact that Winter tells us nearly nothing about the scope of the immunity agreement (an agreement the government and cooperating witness acknowledged was consummated) or the process the attorney (who went unnamed) employed when entering into it, Bulger's read stretches Winter well beyond its holding.  At most it stands for the proposition that United States Attorneys, as a general matter, can enter into informal immunity agreements in certain circumstances, see id. at 1132-35, and we do not conclude otherwise today.  Rather we simply find that based on the facts of this particular case, Bulger did not establish that O'Sullivan entered into an agreement with him or that he would have had the authority to do so.  Winter is simply not helpful to Bulger's cause.

[17] Margolis wrote: "I am advised that a thorough search of the records of DOJ and the FBI disclosed no documentation that James Bulger was ever actually authorized to engage in any criminal activity."

his burden of establishing the very existence of an enforceable immunity agreement be it written or otherwise.

And the court was right to do so. Despite repeated opportunities, Bulger declined to make a further proffer in support of his immunity claim and likewise declined the court's offer of an evidentiary hearing to test the Margolis affidavit. Bulger took a calculated risk, choosing this course based on a strident belief that the court was not authorized to decide the matter pretrial, but, as we said above, that belief was misguided. Faced with the scarcity of evidence offered by Bulger, and the Margolis affidavit, we cannot say that the court clearly erred in finding the evidence did not establish the existence of a valid and binding immunity agreement.

That facet of the appeal decided, we soldier on.

### III. THE MARTORANO CONCERNS

Bulger next presents a series of arguments that John Martorano, Bulger's former Winter Hill compatriot turned government witness, sits at the center of. We chart the relevant background before proceeding to the arguments' particulars.

### A. Background

As the reader now knows, Martorano cut a deal. He started negotiating with the government back in 1998, ultimately admitting to involvement in twenty murders, twelve of which stemmed from his Winter Hill days. He pled guilty to ten (federally charged)

murders, some other federal crimes, and two state murder charges. In exchange for his guilty pleas, and his agreement to cooperate in the prosecution of Bulger, Flemmi, and any corrupt law enforcement members, Martorano walked away with just a fourteen-year sentence plus five years' supervised release and by the time of Bulger's trial, he was a free man. The information Martorano provided ended up leading to murder charges against Bulger, Flemmi, Bulger's FBI handler Connolly, and another FBI agent, Paul Rico.

Fast forward to October of 2012, when, about eight months before Bulger's trial got underway, the government received an anonymous letter. The letter alleged that Martorano (who of course was a slated trial witness) was presently engaged in illegal gambling activities and that his law enforcement handler, Massachusetts State Police Lieutenant Stephen Johnson, was impeding any attempts to investigate or prosecute this behavior. The government filed an ex parte motion with the court alerting it to the letter and indicating that an investigation would follow.

The investigation was completed by the State Police, which detailed its findings in an extensive written report, a few months later. The government informed the court of the end result, which was that after interviewing a number of witness and reviewing various exhibits, the investigators concluded that the anonymous letter's allegations leveled against Lieutenant Johnson were unfounded. The court granted a protective order for the anonymous

letter, which prevented anyone else, including Bulger, from seeing it.

A few months later, and about a month before trial, the government alerted the defense to the allegations that Martorano was gambling illegally and provided reports from some of the investigation's interviews, including interviews with Martorano and other involved individuals, which basically contained denials of any wrongdoing.[18]  It did not provide the State Police's final investigative report or the anonymous complainant's letter.

A few weeks after that (and the day before jury selection) Bulger filed a motion, pursuant to Federal Rule of Criminal Procedure 16 and Brady v. Maryland, 373 U.S. 83 (1963), seeking all materials related to accusations of Martorano's ongoing criminal conduct and Lieutenant Johnson's supposed shielding of Martorano from investigation.  According to Bulger, the materials could be exculpatory and any investigative forbearance exercised by law enforcement towards Martorano -- that is, Johnson protecting Martorano and insulating his criminal activity -- would constitute a promise, reward or inducement that should have been disclosed. Bulger then filed a second motion seeking the full transcript of the interview with the anonymous complainant, who had turned out

---

[18] During trial, defense counsel questioned Martorano regarding the allegations and he again denied any wrongdoing, indicating that he simply gambled with a friend at a casino.

to be Massachusetts State Police Trooper Nunzio Orlando.[19]  He also sought to stay the start of trial until these issues were resolved.

The trial judge reviewed the anonymous letter (Judge Stearns had reviewed it the first time around) and the State Police investigative report, which taken together we will refer to as the ex parte materials.  After doing so, the court issued an oral ruling.

The court, which noted that a "full-fledged investigation" had been undertaken by the State Police, found that the government was not legally required to turn over materials related to the tipster's allegations against Lieutenant Johnson since they "were determined to be not just unsubstantiated . . . but, quote, false and not factual."  The court further found that, even if true, the allegation that Johnson was protecting Martorano would only be relevant if Martorano knew about this perk and there was no suggestion that he had any such knowledge.  As for Martorano's alleged illegal gambling itself, the court noted that the government had turned over documents to the defense related to those allegations.  After the court delivered its ruling, defense counsel then questioned whether he would be allowed to call Trooper Orlando (the formerly anonymous complainant who spurred the

---

[19] It is unclear precisely when it became known that Orlando was the complainant.  The government in its brief to this court suggests that Bulger's attorneys had their own sources of information regarding Orlando's complaint.

illegal gambling investigation) as a witness and the court indicated that it would have to the give the question some further thought.

With the issue resolved (at least as to the ex parte materials), trial got underway and, as planned, Martorano was called by the government to testify about Bulger's criminal past. Not surprisingly, the deal he struck with the government also came up. Martorano's 1998 plea agreement was entered into evidence, and he was questioned by both the prosecution and defense about his plea negotiations, along with the criminal conduct that put Martorano in the spot he was in. More on the specifics later, but for now it suffices to note that some of the questioning had to do with which of his criminal cohorts Martorano was required to provide information about, or testify against, pursuant to his plea deal.

Meanwhile, as the trial plodded on, the parties quibbled over potential witnesses. As we said, the judge had left open the issue of whether Trooper Orlando could testify. With the issue still up in the air, Bulger went ahead and placed Orlando on his trial witness list. Citing various rules of evidence, the government moved to preclude Orlando as a witness, along with others related to the gambling investigation, arguing that they were being called simply to rehash the false accusations.

The court agreed. In a ruling from the bench, it precluded Orlando from testifying, indicating that there was no basis for admitting his testimony since the cover-up allegation had been debunked. And assuming the defense wanted to impugn Martorano's credibility with the testimony about the illegal gambling allegations (as opposed to the supposed cover-up itself), the judge opined that such evidence would be inadmissible under Federal Rule of Evidence 608. See Fed. R. Evid. 608(b) (providing that generally speaking "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness").

With the stage set, we proceed to the arguments Bulger makes on appeal.

### B. Martorano's Ongoing Criminal Conduct

Bulger remains unhappy with the court's restrictive decisions relative to the supposed cover-up of Martorano's ongoing criminal gambling conduct. He argues that he was entitled to the ex parte materials (the anonymous letter and State Police investigative report) under Brady and, hence, the court's decision to deny him access to the materials was in error. For the same reasons Bulger assigns error to that decision, Bulger also takes exception to the court precluding Trooper Orlando from testifying.[20] The government

---

[20] Bulger's argument almost solely focuses on the exclusion of Orlando as a witness. However, he briefly mentions, and

stands by the adequacy of its disclosure, arguing that it was not required to turn over evidence relative to unfounded allegations of investigative forbearance.  And given that Orlando could only testify about disproven allegations, he was properly excluded.

### i. Ex Parte Materials

As to Bulger's access to the ex parte materials, "[w]e review a district court's Brady determinations after its in camera review for an abuse of discretion."  United States v. López-Díaz, 794 F.3d 106, 116 (1st Cir. 2015); United States v. Caro-Muñiz, 406 F.3d 22, 29 (1st Cir. 2005).

Brady dictates that the government must "disclose 'evidence favorable to an accused' that is 'material either to guilt or to punishment.'" United States v. Cruz-Feliciano, 786 F.3d 78, 87 (1st Cir. 2015) (quoting Brady, 373 U.S. at 87); see also Giglio v. United States, 405 U.S. 150, 150-51, 154-55 (1972) (requiring the government to disclose evidence of a promise it made to a witness).  Favorable could mean exculpatory or impeaching in nature, and material means "a reasonable probability that, had it

---

criticizes, the judge's decision to preclude as witnesses Neil Cherkas and Dominic Masella, two Martorano associates whose names came up in connection with the gambling investigation and who Bulger identified as potential witnesses.  Because Bulger failed to develop this argument in any meaningful way, we deem it waived and focus (as he does) on Orlando.  See Mazariegos v. Lynch, 790 F.3d 280, 285 n.5 (1st Cir. 2015) (providing that failure to develop an argument waives it).

been disclosed, the result of the proceeding would have been different." <u>Cruz-Feliciano</u>, 786 F.3d at 87.

Bulger contends that the ex parte materials qualify because investigative forbearance that inured to Martorano's benefit, which Bulger claims occurred, would not only call into question Martorano's credibility but would fit squarely within the defense's theory that the government was heaping benefits on potential witnesses to secure certain convictions. Said another way, Bulger thinks the ex parte materials were impeaching in nature in the sense that they might affect the "jury's estimate of the truthfulness and reliability of" Martorano, which could have meant the difference here between acquittal and conviction. <u>Conley</u> v. <u>United States</u>, 415 F.3d 183, 189 (1st Cir. 2005) (quoting <u>Napue</u> v. <u>Illinois</u>, 360 U.S. 264, 269, (1959)).[21]

---

[21] Bulger's focal point, both as to the ex parte materials and the possible testimony of Trooper Orlando, is its potential to show that the government was heaping a benefit on Martorano by allowing his criminal activity to go unchecked, which might call his credibility into question. Bulger does not appear to argue that any tangential evidence of the alleged illegal gambling itself, which might be contained in the materials, or spoken to by Orlando, was relevant for that same purpose. To the extent he is, which we doubt and in any event would be an underdeveloped argument, it is not a particularly persuasive position. For starters, like we said above, the government turned over documents connected to the illegal gambling allegations themselves. To the extent Bulger was hunting for more, that evidence would be inadmissible, <u>see</u> Fed. R. Evid. 608(b) (providing, except in circumstances not relevant here, that "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness"), which would cause problems not only for Orlando's testimony but also for the ex parte

The theory Bulger floats necessarily requires a couple of things. Johnson must have been complicit in ignoring some sort of illegal gambling on Martorano's part, and Martorano must have been aware that Johnson was looking the other way. The problem is this. As the trial court found after reviewing the ex parte materials -- and which our review confirms -- the allegations of impermissible protection leveled against Lieutenant Johnson were debunked. Specifically, the ex parte materials made clear that the Massachusetts State Police conducted an extensive investigation, which included a number of interviews, along with evidence gathering and analysis. After all this, the investigators concluded that the allegations aimed at Johnson were deemed, as the court reported below, "false and not factual." And even had some untoward behavior on Johnson's part been discovered, there was no indication or even suggestion that Martorano knew what Johnson was purported to be up to.

This being the state of things, we cannot conclude that the court abused its discretion in holding that Bulger was not entitled to the ex parte materials under Brady or Giglio (or any of their progeny) and, as a result, in declining to stay the trial. See,

materials as well. See DeCologero v. United States, 802 F.3d 155, 162 (1st Cir. 2015) ("Withheld information is material under Brady only if it would have been admissible at trial or would have led to admissible evidence.").

- 35 -

e.g., United States v. Souffront, 338 F.3d 809, 823 (7th Cir. 2003) (finding that "[t]he failure to disclose untrustworthy and unsubstantiated allegations against a government witness is not a Brady violation"); United States v. Ray, 61 F. App'x 37, 54 (4th Cir. 2003) (finding that the government's delayed disclosure of a statement did not violate Brady because the statement was "sheer speculation"); United States v. Locascio, 6 F.3d 924, 949 (2d Cir. 1993) (affirming the district court's conclusion that no Brady violation occurred because, in part, the newly discovered government reports contained "untrustworthy" allegations).

Orlando's allegations, which Bulger supposed were both favorable and material, were disproven and allowing him to rummage through the ex parte materials would have been just the type of fishing exhibition that our jurisprudence does not contemplate. See Caro-Muñiz, 406 F.3d at 29 ("Brady does not permit a defendant to conduct an in camera fishing expedition through the government's files.") (internal quotation marks omitted). The court did not abuse its discretion in denying Bulger access to the materials.

That signals the end of this issue, but we think the following bears mention. To be clear, our conclusion today by no means suggests that the government can sidestep its Brady obligations simply by conducting its own investigation and determining that potentially discoverable allegations are unsubstantiated. Our holding is limited to the facts of this case. Here, the court

conducted an in camera review of a significant amount of ex parte materials, following a comprehensive internal State Police investigation, which, by all indications, was conducted in the ordinary course in response to a complaint lodged against one of its officers. The court reviewed not only the final investigative report, and the conclusions contained therein, but more impartial documents, including interview summaries and excerpts. Based on these, the court concluded, and our review confirmed, that not only were the allegations dubious and unsupported but they were false and not factual. Given all this, plus the absence of any indication that the police investigation was conducted in bad faith or skewed to reach a certain result, we cannot find that the court's Brady ruling was an abuse of discretion.

## ii. Excluded Witness

Similarly the court did not abuse its discretion in precluding Trooper Orlando from testifying. See United States v. Occhiuto, 784 F.3d 862, 867 (1st Cir. 2015) (providing that a district court's denial of a defendant's request to call a witness engenders abuse-of-discretion review). Orlando's testimony, Bulger says, was further evidence of the government's charitable investigative forbearance and therefore had the impeaching potential to impugn Martorano's credibility. But, as explained above, the allegations of a cover-up on Johnson's part were disproven and, therefore, any testimony Orlando could offer relative to the issue would have

been irrelevant and highly prejudicial.  See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."); Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice.").

With the proffered testimony failing to hit the essential prerequisites for admissibility, the court's decision to exclude it falls comfortably within its broad discretionary power to exclude evidence.  United States v. Maldonado-García, 446 F.3d 227, 231-32 (1st Cir. 2006) (explaining that "district courts enjoy wide latitude in passing upon the relevancy of evidence"); United States v. Norton, 26 F.3d 240, 243 (1st Cir. 1994) ("The district court is vested with broad discretionary power to admit or exclude evidence.").

We will not further belabor the point.  This aspect of the appeal disposed of, we continue on to Bulger's other Martorano-based argument.

### C. Martorano's Side Deal

As we mentioned earlier, Martorano was asked on the stand about which of his cohorts he was expected to provide information about, or testify against, pursuant to his plea deal. Additionally, Massachusetts State Trooper Thomas Foley, who spent much of his career investigating organized crime in Boston and who also testified at Bulger's trial, was asked about his understanding of Martorano's deal with the government.  To this court, Bulger

homes in on this testimony from Martorano and Foley.  But bear with us because his argument is hard to describe, hard to follow, and difficult to square with the legal framework that he attempts to fit it into.

As best we can tell, Bulger claims that the testimonies Martorano and Foley gave in an entirely different case (a Florida state case against Connolly, Bulger's FBI handler), which defense counsel had Martorano and Foley read into the record during Bulger's trial, establish that the government made a favorable promise to Martorano when negotiating his plea agreement. Specifically, in Bulger's opinion, the testimony reveals that the government made some sort of side deal or off-the-books promise to Martorano that he would never be required to testify against his family or close friends, namely, his brother, James Martorano, or friends Howie Winter and Pat Nee, who all had ties to Winter Hill. This side deal, Bulger argues, was a benefit the government heaped on Martorano that could have been impeaching in nature as it would have cast doubt on his veracity.

Accordingly Bulger makes a couple of claims. One, the government was required to disclose the supposed off-the-books promise as impeachment evidence under Brady.  And, two, the prosecutor acted improperly by engaging in what Bulger suggests were cagey lines of questioning that obfuscated the alleged back door promise and allowed Martorano to testify falsely about who he

was obligated to testify against.[22]  The government denies any wrongdoing but pays little attention to Bulger's Brady argument, instead focusing on the false testimony piece.  On that front, according to the government, its examination of Martorano produced only accurate information about who and what he was required to testify about pursuant to his plea agreement.  Regardless, we take up both pieces of Bulger's claim.

### i. Disclosure of an Agreement

The lack of accord between how the parties treat this issue might stem from something we noted at the start of this side-deal discussion: it is difficult to fit Bulger's argument into the legal framework in which one typically finds a Brady failure-to-turn-over-evidence claim.  See United States v. Agurs, 427 U.S. 97, 107-08 (1976) (explaining the typical contexts in which Brady claims arise).

The problem is a very basic one.  We have no Brady decision to review.  By his own admission, when the purported non-disclosure arose at trial, Bulger never asked the judge to decide whether an off-the-books promise existed or whether any Brady violation had

---

[22] Bulger tacks on another "example of the prosecution's distortive practices" in his reply brief, claiming that the government repeatedly tried to elicit statements from FBI agent John Morris that contradicted testimony he gave in another case.  Since this argument made its first appearance in the reply brief, we dispatch of it as waived.  Soto-Padró v. Pub. Bldgs. Auth., 675 F.3d 1, 8 (1st Cir. 2012).

occurred.  This was so despite all of the evidence on which he now relies -- Martorano's and Foley's Florida testimony -- being available at trial.  Left with no decision from the trial court, we have no way to employ the abuse of discretion review that we would normally apply to a trial court's Brady decision.  United States v. Celestin, 612 F.3d 14, 22 (1st Cir. 2010); Caro-Muñiz, 406 F.3d at 29.

This being the state of things, we are left perplexed as to what Bulger expects us to do with his claim of Brady error and he does nothing to clear up this confusion.  Bulger provides us with no case law to support the notion that it is proper for us to take up this issue in the first instance, and no law that would shed any light on how such an inquiry might go.  Left in the dark, we decline to venture any farther.  Whether you characterize Bulger's Brady claim as unpreserved because he did not seek a ruling below, or waived for failure to adequately develop it on appeal, his claim fails.  See, e.g., Mazariegos v. Lynch, 790 F.3d 280, 285 n.5 (1st Cir. 2015) (providing that undeveloped arguments devoid of legal support are waived on appeal); Murray v. United States, 704 F.3d 23, 32 n.10 (1st Cir. 2013) (suggesting, in connection with a writ of coram nobis petition, that the petitioner's failure to timely raise a Brady claim below might waive the issue).

## ii. The Prosecutor's Questioning

That leaves us with the prosecutor's questioning, and whether it brought out, or left uncorrected, false testimony about who Martorano was required to testify against.

Courts have long held that prosecutors may not knowingly present false evidence, including false testimony, or allow it to go uncorrected when it happens. Giglio, 405 U.S. at 153; Napue, 360 U.S. at 269; United States v. Flores-Rivera, 787 F.3d 1, 31 (1st Cir. 2015). Based on the record before us, we cannot conclude that this is what happened here.

First, we disagree that the prosecutor, in actuality, represented, or elicited testimony, that Martorano would be compelled to testify against his friends and family, as Bulger maintains. The prosecutor's lines of inquiry Bulger that points to were not directed at whether Martorano was bound to testify, but whether he had provided truthful information about all of the individuals he was asked about. And the questioning that did pertain to his testimonial obligations accurately pointed out in what instances Martorano had to testify. This included a list of targeted individuals, which on its face (and as the questioning bore out), did not include James Martorano, Winter, or Nee.

Second, Martorano's and Foley's Florida testimony -- the record evidence Bulger cites as establishing this supposed side

deal that the prosecutor was obfuscating and allowing Martorano to testify falsely about -- was hardly conclusive.

For example, at defense counsel's urging, Foley read from the transcript of his Florida testimony the following: "At the time we were working on the case, realistically, John Martorano was not going to testify against those individuals." Assuming "those individuals" refers to some combination of James Martorano, Winter and Nee, this sounds more like a general observation on Foley's part as opposed to a firm indication that an actual agreement to that effect existed. The Florida testimony that followed (again Foley read this into the record), "I suppose it was part of an agreement that his attorney made with the U.S. Attorney's Office," is equivocal at best. And when he was asked, in the Florida case, whether the state police were on board with the agreement Foley "suppose[d]" existed, he said: "Unfortunately, we were put in a situation where we had to agree to that." The problem here is that not only was Foley further expounding on a supposition, but he later clarified that his understanding of Martorano's deal came from the proffer period before Martorano's agreement with the government was finalized.

Martorano's testimony, also yanked from the Florida state case and read into the record below, was no more helpful.[23] For

---

[23] Defense counsel had Martorano read the Florida testimony into the record after Martorano, on the stand below, thrice responded

example, in the Florida case, Martorano was asked about having told the government that James was with him during one murder and whether "part of the plea agreement was that couldn't be used against you," to which Martorano answered, "[p]ositively." He responded the same when asked: "So that's something else you got from the government?" The exchange is hard to follow but at most seems to suggest that James's crime could not be used against Martorano. And when asked, "[s]o part of the deal included protection for your brother, James Martorano, right?" (again we are still talking about the Florida testimony), Martorano answered, "[s]ure." This testimony is probably the most supportive of Bulger's position (at least as to a James-based side deal) but we scarcely think it is enough. The response is inexact, as is the nature of the protection.

We can hardly say that these vague snippets, plucked out of context from another trial, establish that the prosecutor elicited, or allowed to go uncorrected, false testimony about the bargain Martorano and the government struck. And when we consider the integration clause in Martorano's plea agreement, providing that the written agreement contained the complete and only agreement between the parties, and the government's consistent

---

"[n]o" when asked whether he thought he could protect his brother James, Winter, and Nee respectively.

claim that it produced all Brady materials pretrial, Bulger's position becomes even more untenable.

While we do not need to go any further, the following is worth a mention. A "conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Agurs, 427 U.S. at 103 (footnote omitted); see also Mastracchio v. Vose, 274 F.3d 590, 601 (1st Cir. 2001). Here the jury heard all about the litany of incentives built into Martorano's plea agreement and his sweeping criminal past. In other words, they had plenty of reasons to question his veracity. It is hard to see how one additional enticement would have upended the jury's estimate of Martorano's credibility.

With that said, we plow on.

## IV. PROSECUTOR'S SPEAKING OBJECTIONS

Bulger's final argument focuses on the prosecutor's continued use of prolonged speaking objections during the trial. Bulger maintains that the objections saturated the jury with improper and inadmissible evidence and opinions. The government, for its part, does not deny engaging to some extent in the verbose practice, but, it insists, the judge intervened when needed and ensured that both sides gave a balanced and fair presentation of the evidence.

## A. Background

At the final pretrial conference the judge cautioned both sides: "In terms of objections, you know, object with a word or two if you think its necessary and citation to the rule, but otherwise, no speaking objections. If I need any more, I'll ask for it." Despite the judge's stated preference, the government sometimes ran afoul of this directive. For example, the prosecutor was heard to say things like: "Objection, this is badgering," or "And I object. There is no good-faith basis for that question, and Mr. Brennan knows that." And (among others) there was: "I object to that, that's an incorrect statement of the law." Despite repeated admonishment from the judge, both in front of the jury and at sidebar, the prosecutor's practice continued.

## B. Analysis

Assuming favorably to Bulger that his claim of error is preserved, our review of whether there was any prosecutorial misconduct is de novo.[24] United States v. Sepúlveda-Hernández, 752 F.3d 22, 31 (1st Cir. 2014). If we conclude such misconduct did occur, we then consider the prejudice piece, that is, "whether the

_____

[24] The government contends that Bulger's claim is at best partially preserved because he did not formally object to all of the speaking objections. And although he did move for a mistrial based in part on the speaking objections, he never renewed that motion even though the government continued with its verbose practice. Given that Bulger did object on multiple occasions to the speaking objections, including moving for a mistrial, we will go ahead and assume the objection preserved.

prosecutor's behavior so poisoned the well that the defendant must be given a new trial." United States v. Vázquez-Botet, 532 F.3d 37, 56 (1st Cir. 2008) (internal quotation marks omitted). Factors include: "the egregiousness of the conduct; the context in which it occurred; whether the court gave curative instructions and what effect these instructions likely had; and the overall strength of the Government's case." Id.

We have some doubts that the prosecutor's use of speaking objections amounted to prosecutorial misconduct, but even assuming it did, we cannot conclude that the conduct so poisoned the well as to warrant a new trial.

First, the conduct is plainly not that egregious. Sure the record shows that the prosecutor did not faithfully adhere to the court's request for clipped objections, but to say, as Bulger does, that counsel was misleading the jury or inserting improper evidence is a stretch. Most of the objections Bulger points to involve proper quibbles with the basis for defense counsel's question. For example, there was: "And I object. There is no good faith basis for that question, and Mr. Brennan knows it." The judge sustained this objection. Or there was: "Objection. That's not a fair characterization." The judge responded by asking defense counsel to rephrase. As we have said, "[c]ounsel should not be held to standards of perfection," Sepúlveda-Hernández, 752 F.3d at 32, and the objections here were not so beyond the pale. Second, though

Bulger points to a fair amount of speaking objections, we are required to place them in context. The objections were made over the course of a lengthy trial and, as the trial judge noted, attorneys on both sides managed to work in some animated commentary while questioning or objecting.

Third, while the court gave no curative instructions, Bulger did not request any. And the court did give plenty of general instructions about trial protocol. On the first day of trial, the judge explained the concept of objections to the jury. The judge indicated that a "lawyer may object," which "simply means that the lawyer's requesting that I make a decision on a particular rule." She clarified: "Statements and arguments by the attorneys are not evidence. The lawyers are not witnesses." Similarly, "[o]bjections are not evidence." The judge repeated the same sentiment in the charge to the jury at the close of the case, and we presume the jury to have followed all of these instructions. See United States v. Gentles, 619 F.3d 75, 82 (1st Cir. 2010) ("It is a well established tenet of our judicial system that juries are presumed to follow such instructions.").

Finally, the government's case was not a weak one. It introduced numerous witnesses and exhibits all pointing towards Bulger's guilt. Given all this, we have no trouble concluding that even had the speaking objections constituted misconduct, Bulger was not prejudiced.

## V. CONCLUSION

For the reasons spelled out above, Bulger got a fair trial and none of the complained-of conduct on the court or government's part warrant reversal of his conviction.[25]  We affirm.

---

[25]  In the interest of completeness, we note that Bulger raised a claim of cumulative error.  Because we find no merit to the individual claims, as a matter of course there can be no cumulative error.  United States v. Brown, 669 F.3d 10, 28 (1st Cir. 2012).